IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **R.P. WALLACE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 96-222C** |
| **v.** | ) | **(Judge Allegra)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

In accordance with paragraph 14 of Appendix A of the Rules of the United States Court of Federal Claims and the Court's order, dated January 22, 2003, as amended, defendant is submitting its memorandum of contentions of fact and law.

INTRODUCTION

Plaintiff, R.P. Wallace, Inc. ("R.P. Wallace"), is contesting the final decision of the Department of the Navy ("Navy") contracting officer, dated December 1, 1995, denying, in its entirety, R.P. Wallace's request, dated June 7, 1995, for an equitable adjustment to the contract price, in the amount of $130,402.00, and remission of $50,000 of liquidated damages assessed by the Navy due to R.P. Wallace's late completion of the contract. R.P. Wallace alleges that it was delayed in the performance of a construction contract with the Navy by defective specifications and by the Navy's actions in reviewing R.P. Wallace's submittals. Therefore, R.P. Wallace argues, it is entitled to an equitable adjustment to the contract price and the remission of all assessed liquidated damages. Subsequently, on January 12, 1998, R.P. Wallace amended its complaint in this action to reduce the amount of the equitable adjustment it was seeking from $130,402.00 to $65,753.65. Coupled with the $50,000 of liquidated damages that R.P. Wallace

was still seeking the remission of, this reduced R.P. Wallace's claim to $115,753.65.

I. Statement Of Facts

In accordance with paragraph 14(a)(1) and (b) of Appendix A of the RCFC, defendant is submitting its statement of the facts that it expects to prove at trial.

On September 28, 1993, the Department of the Navy ("Navy") and the plaintiff, R.P. Wallace, Inc. ("R.P. Wallace"), entered into contract no. N62467-91-C-7226 ("the contract"). The contract called for certain repairs to Building 58 at the Naval Support Activity, New Orleans, Louisiana. These repairs consisted of removing an elevator penthouse, replacing the roof, relocating plumbing and exhaust lines, replacing all existing exterior windows with thermal break insulating glass aluminum frame units, replacing exterior doors and frames, interior and exterior painting, and miscellaneous interior repairs at exterior wall openings. The completion date for the contract was March 12, 1994. The contract provided that liquidated damages would be assessed at the rate of $200 per calendar day of delay, if R.P. Wallace failed to complete the work within the time specified in the contract.

As of November 16, 1993, 25.3 percent of the contract time had elapsed, and R.P. Wallace had performed no work on site. As of January 5, 1994, 55 percent of the contract time had elapsed, and R.P. Wallace had performed no work on site. R.P. Wallace began on-site work on or about February 8, 1994. On February 9, 1994, the Navy issued a cure notice to R.P. Wallace due to its "failure to perform." The Navy pointed out to R.P. Wallace that it had made only "minimal progress toward completion," even though 132 days had elapsed since contract award and only 34 days remained before the contract completion date.

On January 5, 1994, R.P. Wallace submitted its paint submittal. This submittal did not

propose using FS TT-P-645, one of the primers specified in the contract. It was returned, marked "Revise and Resubmit," by the Navy's architect/engineer on February 11, 1994. On February 11, 1994, R.P. Wallace resubmitted its paint submittal, which again did not propose using FS TT-P-645, as specified in the contract. Once again, R.P. Wallace did not seek approval for this variation from the contract's requirements by submitting a written request to the contracting officer. On February 25 1994, the Navy's architect/engineer for this project, Morton-Verges Architects, advised the Navy that it had discovered that the paint specification "FS TT-P-645" was incorrect, and should have been "FS TT-P-664." On March 7, 1994, the Navy authorized R.P. Wallace to use the primer that it had proposed using in its submittal.

On February 28, 1994, 14 days prior to the completion date of the contract, R.P. Wallace submitted its window submittal. Although the submittal did not propose installing windows in conformance with the contract's specifications, R.P. Wallace did not seek approval for this variation from the contract's requirements by submitting a written request to the contracting officer, with documentation of the nature and features of the variation and why the variation was desirable and beneficial to the Government. In addition, R.P. Wallace's window submittal, dated February 28, 1994, did not include a full-size sample. R.P. Wallace did submit a sample shortly thereafter, but on March 11, 1994, the Navy advised R.P. Wallace that its sample was not approved, because the glass samples were shattered.

On March 16, 1994, the Navy rejected R.P. Wallace's window submittal because its details regarding the use of false muntins was not in agreement with the contract's specifications. On March 31, 1994, R.P. Wallace resubmitted its window submittal with a statement by its window supplier that the use of true muntins was incompatible with the wind-load requirements

of the contract for the windows.

On April 11, 1994, the Navy notified R.P. Wallace that its request for a variance from the contract specifications for the muntins was being "referred to both the engineer of record and Public Works engineering for guidance." The Navy also reminded R.P. Wallace that it had failed to submit a full-size window sample with its shop drawings. R.P. Wallace submitted a window sample on or about April 19, 1994. However, the sample was broken when received by the Navy, and it could not be approved. On April 21, 1993, the Navy advised R.P. Wallace that it had approved its request for a variance for the muntins.

Little or no work occurred on the project from the end of March 1994 until September 20, 1994, when the windows, which still had not been approved by the Navy, were delivered to the site.

On August 22, 1994, the Navy notified R.P. Wallace by letter of its intent to extend the contract by 36 days in connection with the window submittals. This 36-day extension represented "the period of time between return of [the] initial submittal (16 March 1994) and approval of [R.P. Wallace's] resubmittal ([21] April 1994)." The letter invited R.P. Wallace to present information to the Navy, if it believed that it was owed additional time for the window submittal; otherwise, the Navy would issue a unilateral modification to the contract that would extend the contract performance period by 36 days.

On September 20, 1994, the Navy approved the windows proposed by R.P. Wallace. The contractor began installing the windows on September 20, 1994, and finished on January 11, 1995, a duration of 113 days. R.P. Wallace's as-planned scheduled contemplated the completion of window installation within 28 days.

On October 21, 1994, the Navy executed modification no. P00005, a unilateral modification to the contract, which granted R.P. Wallace a time extension of 36 calendar days to compensate R.P. Wallace "for any and all window delays for the period between the return of the initial window submittal (16 March 1994) and approval of the resubmittal (26 April 1994)." Modification no. P00005 revised the completion date of the contract to May 5, 1994. Previous modifications had extended the completion date from March 12, 1994, to March 31, 1994.

The Navy took beneficial occupancy of Building 58 from R.P. Wallace on January 11, 1995. The Navy assessed liquidated damages against R.P. Wallace, at the contractually prescribed rate of $200 per day, for 250 days, i.e., from May 6, 1994, through January 10, 1995, for a total of $50,000.

A. Issues Of Fact

1. Whether The Contract's Defective Specifications Caused Delay To The Critical Path Of The Project, Thus Entitling R.P. Wallace To An Equitable Adjustment To The Contract Price And A Time Extension

If a contractor requests an equitable adjustment to the contract price, it must establish three elements: liability, causation, and damages. Servidone Constr. Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991) (citing Wunderlich Construction Co. v. United States, 173 Ct. Cl. 180, 199, 351 F.2d 956, 968 (1965). R.P. Wallace must establish more than just Government liability through defective specifications. It bears the burden of also establishing causation and damages, i.e., that it was damaged, and that the specifications in question were the cause of its damages. Ralph C. Jones Co., Inc. v. United States, 33 Fed. Cl. 327, 331 (1995) (citing Wunderlich Construction Co. v. United States, 173 Ct. Cl. 180, 199, 351 F.2d 956, 968 (1965); Electronic & Missile Facilities, Inc. v. United States, 189 Ct.Cl. 237, 253, 416 F.2d 1345, 1355

(1969)); see Datalect Computer Servs., Ltd. v. United States, 41 Fed.Cl. 720, 722 (1998), aff'd, 215 F.3d 1344 (Fed. Cir.1999) (table), cert. denied, 529 U.S. 1037 (2000).

With respect to the 250 days of delay on this project, R.P. Wallace cannot meet its burden and establish these two elements, i.e., that the defective specifications were the cause of any delay to the contract which resulted in damages to R.P. Wallace and the assessment of liquidated damages by the Navy.

i. Whether The Defective Paint Specification Caused Delay To The The Project, Thus Entitling R.P. Wallace To An Equitable Adjustment

R.P. Wallace contends that defendant is liable to it for an extension of time because the paint specifications were defective. However, even if the paint specifications were defective in part, R.P. Wallace must demonstrate how it was damaged by this defect. R.P. Wallace does not establish when it was delayed by the paint specifications or how long it was delayed. Thus, it fails to meet its burden of establishing liability, causation, and resultant injury. Ralph C. Jones, 33 Fed. Cl. at 331. In addition, R.P. Wallace, when it initially submitted its paint submittal on February 5, 1994, submitted non-compliant products without seeking a variance from the Navy. Therefore, R.P. Wallace failed to adhere to its responsibility under the contract to advise the contracting officer of any variation that it was submitting.

ii. Whether The Defective Window Specification Caused Delay To The Critical Path Of The Project, Thus Entitling R.P. Wallace To An Equitable Adjustment

R.P. Wallace contends that the Navy's window specifications caused delays and disruptions to its performance. Defendant has conceded this issue to the extent that it applies to the 36-day period that was granted to R.P. Wallace by modification P00005. This 36-day period

represented the delay caused to the project beginning on March 16, 1994, when the Navy rejected R.P. Wallace's initial window submittal, and ending on April 21, 1994, when the Navy approved R.P. Wallace's window submittal. However, R.P. Wallace cannot demonstrate any greater delay that is attributable to the Navy's actions.

First, R.P. Wallace can produce no evidence, other than the self-serving assertion of its owner, that it was delayed in finding a window manufacturer because of the contract's specifications pertaining to windows. R.P. Wallace has produced no documents from any manufacturer that it allegedly contacted other than its ultimate supplier, Alenco. In fact, even when R.P. Wallace did submit its window submittal on February 28, 1994, just two weeks prior to the original contract completion date, it did not notify the Navy of its alleged inability to find a supplier of the specified windows.

Second, R.P. Wallace cannot demonstrate any Government-caused delay between the Navy's approval of the window submittal on April 26, 1994, and the delivery of the windows almost five months later on September 20, 1994. R.P. Wallace had anticipated a period of six weeks for fabrication and delivery of the windows to the construction site, and it cannot explain how the Navy's actions caused this 16-week delay.

Finally, once the windows arrived in September 1994, R.P. Wallace required almost three and a half months, i.e., to January 11, 1995, to install them, even though it had initially projected a duration of four weeks for window installation. R.P. Wallace cannot show how the Navy's actions were responsible for this two-and-a-half-month delay in the installation of the windows.

Therefore, R.P. Wallace fails to meet its burden of establishing liability, causation, and resultant injury with respect to the contract's window specifications. Ralph C. Jones, 33 Fed. Cl.

at 331. In addition, R.P. Wallace, when it initially submitted its window submittal on February 28, 1994, submitted non-compliant products without seeking a variance from the Navy. Therefore, R.P. Wallace failed to adhere to its responsibility under the contract to advise the contracting officer of any variation that it was submitting.

## CONCLUSION

WHEREFORE, defendant requests that the Court enter judgment in its favor, order that the complaint be dismissed, and grant defendant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

s/Deborah A. Bynum

DEBORAH A. BYNUM
Assistant Director

s/Michael F. Kiely

MICHAEL F. KIELY
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
1100 L St., NW, 8th Floor
Washington, D.C. 20530
(202) 305-7572

Attorneys for Defendant

OF COUNSEL

ALAN CARAMELLA, ESQ.
Department of the Navy
Washington, DC 20374

Date: March 31, 2003