**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **R.P. WALLACE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 96-222C** |
| **v.** | ) | **(Judge Allegra)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**JOINT STIPULATION OF FACTS**

Pursuant to Appendix A of the Rules of the Court of Federal Claims, the parties stipulate to the following facts:

A. Operative Facts With Respect To The Requirements Of The Contract

1. On September 28, 1993, the Department of the Navy ("Navy") and the plaintiff, R.P. Wallace, Inc. ("R.P. Wallace"), entered into contract no. N62467-91-C-7226 ("the contract").

2. The contract called for certain repairs to Building 58 at the Naval Support Activity, New Orleans, Louisiana. These repairs consisted of removing an elevator penthouse, replacing the roof, relocating plumbing and exhaust lines, replacing all existing exterior windows with thermal break insulating glass aluminum frame units, replacing exterior doors and frames, interior and exterior painting, and miscellaneous interior repairs at exterior wall openings.

3. The contract required R.P. Wallace to commence work ten days after award, and to finish all work under the contract 165 days after award.

4. Based upon an award date of September 28, 1993, the original completion date for the contract was March 12, 1994.

5. The contract incorporated by reference Federal Acquisition Regulation 52.236-21

(Specifications and Drawings for Construction (APR 1984)), which stated that discrepancies between the drawings and specifications should be "promptly submitted to the Contracting Officer."

6. Section 01010, ¶ 1.9, of the contract provided that liquidated damages would be assessed at the rate of $200 per calendar day of delay, if R.P. Wallace failed to complete the work within the time specified in the contract.

7. Section 01300, ¶ 1.3.2, of the contract identified three types of submittals: shop drawings, product data, and samples. The contract defined "product data" as

> Preprinted materials such as illustrations, standard schedules, performance charts, instructions, brochures, diagrams, manufacturer's descriptive literature, catalog data, and other data to illustrate a portion of the work, but not prepared exclusively for this Contract.

8. Section 01300, ¶ 1.5.4, of the contract provided that

> Variations from contract requirements require Government approval pursuant to [the] Contract Clause entitled "Specifications and Drawings for Construction" and will be considered where advantageous to the Government. When proposing a variation, submit a written request to the Contracting Officer, with documentation of the nature and features of the variation and why the variation is desirable and beneficial to the Government. . . . Identify the proposed variation separately and include the documentation for the proposed variation along with the required submittal for the item.

9. Section 01300, ¶ 1.6.3.b, of the contract required R.P. Wallace, when providing submittals that contained product data, to "[i]ndicate, by prominent notation, each product which is being submitted."

10. Section 01300, ¶ 1.6.5.a(1), of the contract required R.P. Wallace, when producing a submittal of "equipment or device," as opposed to materials, such as piping or

flashing, to furnish a "full size" sample.

11. Section 01300, ¶ 1.9, SD-14, of the contract further defined "samples" in the paragraph entitled "Schedule of Submittal Descriptions" as consisting of "both fabricated and unfabricated physical examples of materials, products, and units of work as complete units or as portions of units of work. A type of sample."

12. Section 08520, ¶ 1.4.6.a, of the contract required R.P. Wallace to submit as a sample "one full-size window with muntins of type proposed for use, complete with [American Architectural Manufacturers Association] label, glazing, hardware, anchors, and other accessories."

13. General Note 16 of sheet 1 of the contract drawings provided that the "Contractor will not be allowed to remove more windows than can be replaced in the same day."

14. Detail 3/4 of sheet 4 of the contract drawings required that the aluminum panning of the window jambs be convex.

15. The federal specifications ("FS") for one of the primers specified in the contract was "FS TT-P-645 - (Rev. B) Primer, Paint, Zinc-Molybdate, Alkyd Type."

16. The contract's plans and specifications were prepared by Morton-Verges, Architects ("A/E"), the Navy's architect/engineer for this project, who also reviewed and commented on the submittals for the Navy.

B. Operative Facts With Respect To Contract Performance By R.P. Wallace

17. As of November 16, 1993, 25.3 per cent of the contract time had elapsed, and R.P. Wallace had performed no work on site.

18. On January 3, 1994, R.P. Wallace advised the Navy that its window submittals

would be provided by January 7, 1994. At that time, the Navy reminded R.P. Wallace of the contract requirement for a full-size window sample.

19. As of January 5, 1994, 55 per cent of the contract time had elapsed, and R.P. Wallace had performed no work on site. R.P. Wallace began on-site work on or about February 8, 1994.

20. On January 5, 1994, R.P. Wallace submitted its paint submittal. This submittal did not propose using FS TT-P-645, one of the primers specified in the contract. It was returned, marked "Revise and Resubmit," by the A/E on January 11, 1994. The Navy, at the A/E's recommendation, rejected the paint schedule submitted by R.P. Wallace as being non-compliant. R.P. Wallace was unable to find a metal surface primer that complied with FS TT-P-645.

21. Although the paint submittal did not propose using paint called for by the contract's specifications, R.P. Wallace did not seek approval for this variation from the contract's requirements by submitting a written request to the contracting officer, with documentation of the nature and features of the variation and why the variation was desirable and beneficial to the Government.

22. On February 7, 1994, the Navy issued a cure notice to R.P. Wallace due to its "failure to perform." The Navy pointed out to R.P. Wallace that it had made only "minimal progress toward completion," even though 132 days had elapsed since contract award and only 34 days remained before the contract completion date.

23. On February 11, 1994, R.P. Wallace resubmitted its paint submittal, which again did not propose using FS TT-P-645, as specified in the contract. Once again, R.P. Wallace did not seek approval for this variation from the contract's requirements by submitting a written

request to the contracting officer.

24. When Morton Verges drafted the paint specifications for the contract, it had identified the wrong Federal specification to be applied to selection of the metal surface primer. The specifications called for R.P. Wallace to select a primer that complied with FS TT-P-645. However, the proper Federal specification was FS TT-P-664.

25. On February 25, 1994, the A/E reviewed R.P. Wallace's second submittal for paint, and the A/E again recommended that it be rejected.

26. On February 25, 1994, Morton-Verges advised the Navy that it had discovered that the paint specification "FS TT-P-645" was incorrect, and should have been "FS TT-P-664." On March 7, 1994, the Navy authorized R.P. Wallace to use the primer that it had proposed using in its submittal.

27. On February 28, 1994, 14 days prior to the completion date of the contract, R.P. Wallace submitted its window submittal. Although the submittal did not propose installing windows in conformance with the contract's specifications, R.P. Wallace did not seek approval for this variation from the contract's requirements by submitting a written request to the contracting officer, with documentation of the nature and features of the variation and why the variation was desirable and beneficial to the Government.

28. R.P. Wallace's window submittal, dated February 28, 1994, did not include a full-size sample. On March 16, 1994, the Navy returned R.P. Wallace's window submittal marked "REVISE AND RESUBMIT" because (1) it proposed a concave panning rather than a convex – or "bull nosed" – panning, and (2) its details regarding the use of false muntins was not in agreement with the contract's drawings. The Navy rejected the window submittal, in part,

because, although it met the wind load requirement, R.P. Wallace had compromised by using false muntins instead of true muntins required by the contract.

29. On March 14, 1994, the A/E recommended to the Navy that it reject R.P. Wallace's window submittal.

30. On March 24, 1994, Alenco, the proposed manufacturer of the windows for R.P. Wallace, responded to the Navy's rejection.

31. On March 30, 1994, Alenco faxed a letter to R.P. Wallace to explain to the Navy why the windows could not be manufactured as specified.

32. On March 31, 1994, R.P. Wallace resubmitted its window submittal, with a statement from Alenco, its window supplier, dated March 24, 1994, that it could "extrude a profile" that would produce a "bull nosed" panning, but the use of true muntins was incompatible with the wind-load requirements of the contract for the windows.

33. The Navy's specifications for the windows were defective in that they included two incompatible requirements: (1) the windows had to meet current wind load requirements to remain intact through a hurricane, and, at the same time, (2) were required to be duplicates of the original windows they were replacing, i.e., to have full muntins between each pane of glass in a multi-pane window. The penetration of the window by true muntins would have weakened the glass to such an extent that it could not meet the wind load requirement. A solid pane for the entire window could meet the wind load requirement; however, the muntins required to maintain the wind load requirement with individual panes would have been much larger than the original muntins, rendering them unacceptable for aesthetic reasons.

34. On April 11, 1994, the Navy notified R.P. Wallace that its request for a variance

from the contract specifications for the muntins was being "referred to both the engineer of record and Public Works engineering for guidance." The Navy also reminded R.P. Wallace that it had failed to submit a full-size window sample with its shop drawings.

35. On April 11, 1994, the Navy told R.P. Wallace that "a full size window sample was not submitted along with the shop drawings and literature as required by paragraph 1.4.6." The Navy then refused to review or approve the product data and shop drawings until it first received a"full-size window sample."

36. R.P. Wallace submitted a window sample on or about April 19, 1994. However, the sample was broken when received by the Navy.

37. On April 21, 1993, the Navy advised R.P. Wallace that it had approved its request for a variance for the muntins.

38. On April 29, 1994, the Navy admitted that "The government is in agreement that the design is defective, and that an equitable time adjustment must be made."

39. Little or no activity occurred at the job site from the end of March 1994 through September 20, 1994, when the windows were delivered to the project site.

40. On May 6, 1994, Alenco received from R.P. Wallace the approved window submittal.

41. On May 11, 1994, Alenco placed an order with its tool and die vendor for the custom extrusion dies needed to create the convex panning.

42. On June 6, 1994, Alenco received the custom extrusion dies and conducted extrusion tests.

43. On July 6, 1994, Alenco received approval from R.P. Wallace for the custom

panning profiles, and released the windows for manufacturing.

44. On August 29, 1994, Alenco sent a "pilot window system" to R.P. Wallace for approval.

45. On September 20, 1994, Alenco delivered the manufactured windows to R.P. Wallace at the job site in New Orleans.

46. R.P. Wallace began installing the windows on September 20, 1994, and finished installing them on January 11, 1995.

47. On February 28, 1994, R.P. Wallace provided the Navy with submittal no. 18, which included product data for the vinyl siding called for by section 07460 of the contract's specifications. R.P. Wallace's submittal for the vinyl siding consisted of an excerpt from a catalogue of Heartland Building Products, Inc, Booneville, Mississippi. The catalogue excerpt listed 11 types of siding, three of which had the thickness that was prescribed by section 07460, ¶ 2.1.2.1, i.e., .044 inches.

48. R.P. Wallace, however, did not indicate which of these three types of siding it was proposing for use on the project.

49. On March 9, 1994, the Navy disapproved R.P. Wallace's submittal no. 18.

50. On March 16, 1993, R.P. Wallace resubmitted submittal no. 18, renumbered as no. 18-A, and indicated which type of. 044-inch vinyl siding it was proposing for the project. The Navy approved this resubmitted submittal on March 22, 1994.

51. On August 22, 1994, the Navy notified R.P. Wallace by letter of its intent to extend the contract by 36 days in connection with the window submittals. This 36-day extension represented "the period of time between return of [the] initial submittal (16 March 1994) and

approval of [R.P. Wallace's] resubmittal (26 April 1994)." The letter invited R.P. Wallace to present information to the Navy, if it believed that it was owed additional time for the window submittal; otherwise, the Navy would issue a unilateral modification to the contract that would extend the contract performance period by 36 days.

52. On October 21, 1994, the Navy executed modification no. P00005, a unilateral modification to the contract, which granted R.P. Wallace a time extension of 36 calendar days to compensate R.P. Wallace "for any and all window delays for the period between the return of the initial window submittal (16 March 1994) and approval of the resubmittal (26 April 1994)."

53. Modification no. P00005 revised the completion date of the contract to May 5, 1994. Previous modifications had extended the completion date from March 12, 1994, to March 31, 1994.

54. The Navy took beneficial occupancy of Building 58 from R.P. Wallace on January 11, 1995.

55. The Navy assessed liquidated damages against R.P. Wallace, at the contractually prescribed rate of $200 per day, for 250 days, i.e., from May 6, 1994, through January 10, 1995, for a total of $50,000.

Pursuant to paragraph 16 of General Order No. 2003 - 42, defendant's counsel represents that plaintiff consents to these stipulations.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

s/Deborah A. Bynum

DEBORAH A. BYNUM
Assistant Director

s/John C. McManus

JOHN C. McMANUS
McManus & Graham, LLP
Suite 2015
20 Executive Park West
Atlanta, GA 30329

Attorney for Plaintiff

s/Michael F. Kiely

MICHAEL F. KIELY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7572

OF COUNSEL

ELLEN M. EVANS
Department of the Navy
Washington, D.C.

Attorneys for Defendant

April 29, 2003