**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **R.P. WALLACE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 96-222C** |
| **v.** | ) | **(Judge Allegra)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF MICHAEL F. KIELY**

In accordance with the Court's order, dated May 7, 2003, as amended, I am respectfully submitting this declaration indicating when and how I discovered certain daily reports of the plaintiff, R.P. Wallace, Inc. ("R.P. Wallace"), that were not included as joint exhibits for trial in this matter.

I, Michael F. Kiely, declare that the following is true and correct:

1. I am the attorney within the Department of Justice having primary responsibility for representing the defendant, the United States, in this case. I have personal knowledge of the matters set forth in this declaration.

2. The complaint was filed in this case on April 24, 1996. I have been attorney of record for defendant in this case since May 5, 1998. My predecessor was Steven E. Gordon, who was attorney of record from May 3, 1996, until May 5, 1998. During my tenure as attorney of record for defendant in this case, I did not receive any requests for the production of documents from R.P. Wallace. Based upon an examination of defendant's files, I believe that R.P. Wallace likewise did not serve any request for the production of documents upon Mr. Gordon.

3. Defendant served a request for production of documents upon R.P. Wallace on or about February 24, 1998, to which it responded on June 22, 1998. Included in that production were copies of R.P. Wallace's daily reports for various dates in 1994 and 1995.

4. On January 21, 2003, shortly before a status conference with the Court regarding a date and venue for trial, plaintiff's counsel, John C. McManus, called me by telephone to advise me, among other things, that R.P. Wallace had retained an expert witness, Victor Ostrowski, and that Mr. Ostrowski would be producing an expert report soon. I, in turn, advised Mr. McManus that defendant would likely retain an expert also, and that I would shortly designate the chosen expert.

5. On or about January 24, 2003, I indicated to Mr. McManus that defendant would be using Stephen Weathers, P.E., Capital Project Management, Inc., 1777 Sentry Parkway West, Abington Hall, Suite 100, Blue Bell, Pennsylvania 19422-2210, as its expert witness.

6. On February 5, 2003, I sent to Mr. Weathers copies of all the contract documents that I had in my files, including R.P. Wallace's daily reports. On February 12, 2003, Mr. Weathers advised me that the materials which I had sent him were missing certain key documents. Specifically, he stated that he did not receive the contract drawings or R.P. Wallace's shop drawings for the window installation, and he stated that the daily reports were incomplete. The daily reports, according to Mr. Weathers, consisted of two distinct documents, a Contractor's Production Report, which was the first page of the reports, and a Contractor's Quality Control Report, which was the second page of the reports. However, the daily reports that defendant had received from R.P. Wallace contained only the Contractor's Quality Control Report for the period of February 8, 1994, through April 20, 1994. Thereupon I called Mr. McManus to seek complete

daily reports for the period of February 8, 1994, through April 20, 1994.

7. In the meantime, Mr. Weathers prepared his expert report without a complete set of the contractor's daily reports. This is reflected in Tab D of his expert report (Joint Exhibit 1), a manpower chart for R.P. Wallace, which shows missing daily reports for two periods, February 8, 1994, through April 20, 1994, for which period we had incomplete reports, and November 22, 1994, through December 14, 1994, for which period we had no reports at all. Mr. Weathers expert report was delivered to Mr. McManus on or about March 18, 2003.

8. I received from Mr. McManus on Friday, March 21, 2003, a complete set of the daily reports for February 8, 1994, through April 20, 1994, and provided them to Mr. Weathers on Monday, March 24, 2003. Mr. Weathers was deposed by R.P. Wallace on March 25, 2003. During his deposition, Mr. Weathers stated that he had reviewed the newly provided reports, but that they did not affect his analysis in any way, and, therefore, he did not amend his report to account for the newly found daily reports.

9. In early April 2003, in an effort to obtain the contract drawings, I contacted Michael Arnone, Inspector, United States Navy, Naval Support Activity, New Orleans, Louisiana. As the Navy's inspector for the project, Mr. Arnone received copies of relevant contract documentation from R.P. Wallace in the normal course of his duties in order to allow him to adequately monitor work on the contract. Mr. Arnone located a box of documents in the office of the Resident Officer in Charge of Construction at the Naval Support Activity, and sent it to me in Washington, D.C. by overnight delivery on Thursday, April 3, 2003.

10.. Upon receipt of the documents from Mr. Arnone on Friday, April 4, 2003, I examined the contents of the box in search of the contract drawings and the window shop

drawings. Several copies of those documents were in the box, along with other core contract documents, i.e., the solicitation and amendments, the contract and modifications, R.P. Wallace's submittals, certified payrolls, progress payment applications, correspondence between R.P. Wallace and the Navy, and R.P. Wallace's daily reports. I removed one set of contract drawings, and sent the box to Mr. Weathers by overnight delivery on April 4, 2003.

11. Mr. Weathers reviewed the contents of the box, made copies of what he needed, and returned the box to me by overnight delivery on Tuesday, April 8, 2003. In mid-April 2003, Mr. Weathers advised me that Mr. Arnone's documents also contained copies of the contractor's daily reports, but he assumed that they were duplicates of the daily reports that R.P. Wallace had produced in discovery as well as the daily reports contained in defendant's files, both of which did not have any daily reports for the period of November 22, 1994, through December 14, 1994. I, myself, did not examine the daily reports from Mr. Arnone's files to see if they matched the daily reports that I had in my files.

12. Following the pre-trial conference on April 21, 2003, at which the Court ordered the parties to prepare six copies of all exhibits, I directed Mr. Weathers to make six copies of his expert report for use at trial.

13. At 1:25 p.m. on May 1, 2003, Mr. McManus advised me by a facsimile transmission that "the complete set of exhibits is contained in the Weathers' report, but I am making one last look-see to make certain and will advise within the next hour or so." (The daily reports in Mr. Weathers' expert report did not include the recently provided missing pages from the reports for February 8, 1994, through April 20, 1994.) Therefore, at that time, I began the process of numbering the exhibits to Mr. Weathers' report as joint exhibits. At 3:11 p.m. on May

1, 2003, Mr. McManus faxed to me 13 letters that he wanted included as joint exhibits in addition to the exhibits in Mr. Weathers' report. These exhibits are found at Joint Exhibits 3-15.

14. During trial, after R.P. Wallace's expert witness, Mr. Ostrowski, had testified, for the first time, that R.P. Wallace's installation schedule for the windows was dependent upon a series of window deliveries by the window manufacturer, Mr. Weathers began to review the daily reports for any mention of this issue. The set of reports that he picked up was the set provided by Mr. Arnone which, unknown until that time, included reports for the period of November 22, 1994, through December 14, 1994. Once these daily reports of R.P. Wallace were located, I decided to use them, principally the reports for December 7-8, 1994, to impeach Ronald P. Wallace's testimony that the delivery of windows in December 1994 and January 1995 was caused by the “unique nature” of the windows, as opposed to the circumstances suggested by the daily reports themselves, i.e., that the window manufacturer had sent windows with the "[w]rong pan pane" (December 7, 1994), and that several windows had "damaged . . . broken . . . [or] incorrect glass" (December 8, 1994).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on May 30, 2003.

s/Michael F. Kiely

MICHAEL F. KIELY
Attorney, Civil Division
U.S. Department of Justice