IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| R.P. WALLACE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 96-222C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL POST-TRIAL MEMORANDUM ON THE ISSUE OF CAUSATION**

In accordance with the Court's December 3, 2003 order, defendant, the United States, submits this supplemental post-trial memorandum addressing the issue of causation.

## I. Introduction

The question posed by the Court concerns whether defective specifications were the cause of delays in the (1) submittal, (2) fabrication, and (3) installation phases of the window portion of the contract. In order to respond to this question, the pertinent specification defect must first be defined. The defective specification at issue in this case is limited to the requirement surrounding the use of true muntins versus false-type muntins. Specifically, the contract required the use of true muntins, while at the same time, certain performance characteristics of the windows required by the contract (i.e., wind load requirements) could not be achieved with the use of historical-type true muntins. Shortly after plaintiff, R.P. Wallace, Inc. ("Wallace"), brought the issue to the Navy's attention, the Navy allowed a variance accepting the proposed use of a false-type muntin. Exh. 1(25); Tr. 909-10.[1]

[1] "Ex. __" refers to the exhibits used at trial. "Exh. 1(__)" refers specifically to trial exhibit number one, the Government's expert report filed by Steven A. Weathers, and the corresponding tab number contained within that report. "Tr. __" refers to the transcript from the trial.

It is not clear when Wallace or its window fabricator discovered the discrepancy between the wind load requirement and the requirement for true muntins, but it is clear Wallace did not notify the Navy of any problem with the window specifications until March 31, 1994, after the first window submittal was rejected and resubmitted. Exh. 1(22, 24). It is also clear Wallace did not notify the Navy of any alleged design or procurement problems relating to the muntins issue during fabrication or installation of the windows. Tr. 556, 558, 617-618.

In this action, Wallace seeks remission of liquidated damages (excusable delay) and compensable delay damages. Although the proof required to establish compensable delay differs from that required to show excusable delay, Wallace bears the burden of proof as to both.

The only delay attributable to the Government for the windows on this project is 36 calendar days during the submittal phase, for which the Government has provided an extension in modification P00005.[2] These 36 days represent the period of time between when the Government rejected Wallace's non-complying window submittal and when it approved that window upon resubmission, subject to otherwise complying with the contract specifications.[3] Because the approval upon resubmission was related to the muntin problem, the Government accepted responsibility for the associated delay. However, once this problem was resolved, there was no further delay associated with it, nor complained of contemporaneously by Wallace.

---

[2] Plaintiff's claim before the contracting officer also included allegations regarding defects in the painting and siding specifications, but these issues were not pursued because both plaintiff's consultant and the Government's scheduling expert agreed they did not impact the critical path. Exh. 1 at 6, 15-16, Exh. 2; Tr. at 479-80, 489-91.

[3] The 36 days granted in this modification are for excusable rather than compensable delay because Wallace was responsible for concurrent delay during this same time. In its claim, Wallace concedes 97 days of concurrent contractor delay, including these 36 days. Exh. 1(12) at 7.

As discussed below, the delay suffered by Wallace attributable to the muntin window specification is clearly identifiable, and thus easily segregable from all other delay to the project. Wallace has not proved any other delays attributable to the Government that have not already been covered by modification. Therefore, Wallace's claims for remission of liquidated damages and for compensable delay damages must be denied.

## II. The Burden Is On Wallace To Prove Excusable Delay

Liquidated damages for late completion accrue from the contract completion date, as adjusted for excusable delays, until the project is substantially complete. Racine Screw Co. v. United States, 156 Ct. Cl. 256 (1962). The contract completion date for this contract, as adjusted by modifications, was May 6, 1994. Wallace achieved substantial completion on January 11, 1995, 250 days late. In accordance with the contract, the Navy assessed $50,000 in liquidated damages against Wallace for completing the construction project 250 days beyond the contract's completion date. Exh. 1(18).

A contractor seeking remission of liquidated damages has the burden of proving the delay to the critical path was excusable. Sauer, Inc. v. Danzig, 224 F.3d 1340, 1345, 1347 (Fed. Cir.2000). Causation is a question of fact. J.D. Hedin Constr. Co. v. United States, 347 F.2d 235, 245 (Ct. Cl. 1965) (holding that it is strictly a factual determination as to whether the Government's faulty specifications caused the actual delays or if they were occasioned by factors outside the Government's control).

To establish that delay is excusable, the contractor must prove the delay was beyond the control and without the fault or negligence of the contractor. The contractor must further prove it took reasonable action to perform the contract notwithstanding the occurrence of such excuse.

Sauer, 224 F.3d at 1345. Also, the excusable delay provision in the Default clause incorporated by reference in Wallace's contract requires that the delay must be without the fault or negligence of any subcontractors or suppliers. See FAR 52.549-10, Exh. 2(16) at 6 ("Contract Clauses").

In its claim, Wallace sought remission of all of the liquidated damages assessed, but at trial, through its consultant, conceded responsibility for 98 days of the delay.[4] Wallace attempted to establish excusable delay for the remaining days by assigning most of the delay in the submittal phase and all delay in the fabrication and installation phases to the Government. However, Wallace presented no direct evidence to show any causal connection between any of these delays and the muntin issue.

Mr. R.P. Wallace, president of R.P. Wallace, Inc., testified in a conclusory fashion that all of the project delay was attributable to the Government because of the defect in the specification relating to the muntins. Wallace's scheduling consultant merely followed Mr. Wallace's testimony and attributed project delays to the Government due to the muntins issue without providing any causal basis. His opinion was based entirely on representations made by Mr. Wallace.

In sharp contrast, the Government's construction management and scheduling expert testified credibly as to why the only delay attributable to the muntin problem was the 36-day delay in the submittal phase addressed by modification P00005. Because the Government already excused this delay, and Wallace has failed to establish any further delay attributable to

[4] As previously noted, Wallace conceded 97 days of concurrent delay in its claim. Exh. 1(12). Later, through its scheduling consultant, Wallace admitted to 98 days of delay attributed solely to Wallace, placing 90 of these days in the submittal phase of the job, and another 8 in the installation phase. Exh. 2 at 8; Tr. 424-26, 434, 436-37, 457, 471.

the Government or otherwise excusable, Wallace's claim for remission of liquidated damages must be denied.

## III. The Burden Is On Wallace To Prove Compensable Delay

In its claim before the contracting officer, Wallace asserted entitlement to compensation for 249 days of alleged Government-caused delay. Exh. 1(12). By the time of trial, Wallace adjusted its request for compensation downward to 207 days. Exh. 2 at 8; Exh 1(15). Wallace seeks compensation for both field and home office overhead for delays allegedly resulting from the defective window specification.[5]

As noted above, the record does not support a conclusion that Wallace met its burden of proving causation so as to be entitled to a time extension or additional compensation. However, even if the Court were to find Wallace met its burden on causation, it would still have to find Wallace met all the requirements for entitlement to compensable delay damages in order to grant plaintiff the recovery it seeks.

In order to recover extended field and home office overhead the contractor has the burden to prove the delay was proximately caused solely by the Government and was not concurrent with any contractor delay. William F. Klingensmith, Inc. V. United States, 731 F.2d 805, 809 (Fed. Cir. 1984). In other words, to demonstrate compensable delay, a contractor must separate Government-caused delays from its own delays. Sauer, 224 F.3d at 1348 (citing T. Brown Constructors, Inc. v. Pena, 132 F.3d 724, 734-35 (Fed. Cir. 1998)).

---

[5] Compensable field office overhead costs are those costs incurred directly on a project due solely to Government-caused delay. Blinderman Constr. Co. v. United States, 39 Fed. Cl. 529, 588 n. 56 (1997), aff'd 178 F.3d 1307 (Fed. Cir. 1998). Home office overhead costs are those costs expended for the benefit of the whole business that cannot be attributed to any particular contract. Melka Marine, Inc. v. United States, 187 F.3d 1370, 1375 (Fed. Cir. 1999).

To recover home office overhead Wallace must prove the prerequisites to application of the Eichleay formula. Charles G. Williams Construction, Inc. v. White, 271 F.3d 1055, 1058 (Fed. Cir. 2001). The Eichleay formula calculates home office overhead costs to be reimbursed if work on a contract was suspended due to Government fault, and if that suspension decreased the stream of direct costs against which to assess a percentage rate for reimbursement. C.B. C. Enterprises, Inc. v. United States, 978 F.2d 669, 671 (Fed. Cir. 1992). The Eichleay formula is the exclusive method for calculating extended home office overhead when a contractor otherwise meets the Eichleay prerequisites. Melka Marine, 187 F.3d at1374-75; Wickham Construction Co. v. Fischer, 12 F.3d 1574, 1580-81 (Fed. Cir. 1994). In order to recover unabsorbed overhead under the Eichleay formula, a contractor must prove: 1) the Government imposed a delay; 2) the Government required the contractor to stand by during the delay, and; 3) that while standing by the contractor was unable to take on additional work. Sauer, 224 F.3d at 1348; Satellite Electric co. v. Dalton, 105 F.3d 1418, 1421 (Fed. Cir. 1997); Interstate General Government Contractors v. West, 12 F.3d 1053, 1055-58 (Fed. Cir. 1993). Wallace has not proven these elements, and thus would not be entitled to recover under the Eichleay formula regardless of any other findings.

## IV. The Record Shows That Wallace Has Not Satisfied Its Burden Of Proof

The evidence in the record shows that Wallace has not satisfied its burden of proof in showing that its delays on the project were excusable or compensable. The pertinent evidence is summarized below.

### A. Summary Of Evidence Relating To The Submittal Phase

As discussed above, the Government was responsible for 36 days of delay during the submittal phase due to the muntin specification. This delay was acknowledged

contemporaneously by the Navy. The Navy issued contract modification P00005, extending the contract completion date by 36 days, from the date it disapproved Wallace's initial false-muntin window submittal (March 16, 1994), to the date the specification was revised (April 21, 1994). Exh. 1(10) at 16-17. This modification accurately addressed the entire delay associated with the defective specification issue. Exh. 1 at 4, 5, 11, 1(12) at 64-65; Tr. 879, 917-18. Wallace has acknowledged that these 36 days of delay were excusable, not compensable. Exh. 1(12) at 7.

Other delays suffered by Wallace during the submittal phase were not attributable to the Government. For example, Wallace's initial submittal was delinquent. Wallace's initial window submittal was made on February 28, 1994, Exh. 1(19), more than 120 days after the date that Wallace's scheduling expert projected that it should have been transmitted (October 31, 1993), Exh. 2 at 3, and just 12 days before the scheduled completion date of the contract. One explanation offered by Wallace was that the window submittal and shop drawings were delayed because window manufacturers would not provide quotes on the window as specified. Exh. 2 at 4. There are no contemporaneous documents or credible testimony to support this allegation.

Notably, Wallace did not present any testimony at trial by its window manufacturer, Alenco Commercial ("Alenco"), or any other window manufacturer, to support its claim that Alenco or any other window manufacturer could not submit a timely proposal. Although Mr. Wallace claimed to have conducted an exhaustive search for a window manufacturer after award, he does not recall when he contacted Alenco. Tr. 62, 64-65. He also testified that he does not recall if he ever had a written purchase order or subcontract agreement with Alenco. Tr. 69, 70. Wallace's project manager, Mr. Fortenberry, testified that he does not recall if Wallace had a subcontract with Alenco or if Alenco ever provided a production schedule. Tr. 205.

There is nothing in the record to establish that Wallace contacted any potential subcontractors or suppliers other than Alenco in order to formulate a decision as to whether or not it could meet the specifications. There also is no evidence that shows when Wallace provided Alenco with a copy of the plans and specifications, much less when Alenco first identified the problem with the muntins.

The only support for plaintiff's assertion that it had difficulty finding a supplier for the windows is Mr. Wallace's testimony, which appears to lack credibility in light of the contemporaneous documents and other evidence presented at trial. Mr. Wallace's testimony consisted of little more than after-the-fact, self-serving conclusions, and lacked specificity as to dates, details, or specific circumstances surrounding the project.

In a meeting on December 9, 1993, Wallace represented to the Navy it had a window supplier and that the window submittal should be received by January 7, 1994. Tr. 65-68; Exh. 1(16). However, as noted above, Wallace did not provide its window submittal until February 28, 1994, 12 days before the contract completion date.

Further, when confronted with the Navy's February 7, 1994 cure notice, which cited Wallace's failure to provide important submittals and emphasized that the Navy considered Wallace's failure to perform a condition endangering completion of the project, Wallace never advised the Navy it was having difficulty finding a window supplier to meet the specifications. Exh. 1(6). Instead, on February 23, 1994, Wallace acknowledged receipt of the cure notice, Exh. 1(8), and, on March 11, 1994, represented that all items required by the cure notice had been submitted. Exh. 1(9). Wallace did not contemporaneously mention any difficulties finding a window supplier. That representation was only made a year later, when Wallace filed a claim

with the contracting officer. Exh. 1(6, 8, 9, 12). Wallace did not inform the Navy of the discrepancy between the true muntins and the wind load requirement until March 31, 1994, when it resubmitted its window submittal. Exh 1(24); Tr. 42-43, 188. There was no excuse for the delay. Tr. 873-75.

Also, Wallace's February 28, 1994 initial window submittal contained a certificate of conformance letter from Alenco to the Navy, dated January 12, 1994. Exh. 1(28); Tr. 81. The early date of this conformance letter raises the question why Wallace did not make its window submittal earlier, i.e., in mid-January, as opposed to late February 1994. Quite obviously, if the requirement for true, as opposed to the false muntins caused Wallace so much difficulty in its search for a supplier, the problem could have (and should have) been brought to the Navy's attention contemporaneously. The evidence does not establish a justifiable reason for Wallace not bringing the muntin issue to the Navy's attention earlier if it was the cause of its submittal delay. Exh. 1(27).

Indeed, as outlined in his report, Mr. Weathers disproved Wallace's contentions that the defective specification caused delay beyond the 36 days granted by the Navy. Exh. 1 at 9-11. In sum, Wallace has failed to show a causal link between the defective specification and its delay in the submittal phase beyond the 36 days of excusable delay granted by the Navy in modification P00005.

**B. Summary Of Evidence Relating To The Fabrication Phase**

Nothing in the record establishes that the problem with the muntin specification caused any delay in the fabrication of the windows. According to Wallace, the fabrication time for the windows should have been eight weeks, at most. Tr. 48, 75, 79-80. However, it took

approximately 22 weeks for the windows to be fabricated and delivered to the site. Exh. 1 at 11-12; Tr. 428. Wallace attributes this delay to the Government, although neither Mr. Wallace nor his consultant could establish a causal relationship between the muntin problem and the length of time it took to manufacture the windows once that problem was rectified.

The muntin problem was resolved on April 21, 1994. Exh. 1(25). On that date, Wallace could have put in its order with Alenco. Thereafter, according to the schedules provided by plaintiff, the windows should have been on site within a couple of months. They did not arrive on site for over five months. Exh. 1(7) at 64. At trial, Wallace suggested that the excuse for the lengthy fabrication time was that Alenco was unable to produce the specified window within eight weeks because the windows were of a "non-standard" type. Tr. 45, 77, 122-123. Wallace's characterization of the window as "non-standard" does not provide any basis for attributing delay to the Government, or to the muntin issue.

The revised window submittal that was approved on April 21, 1994 (with a false muntin) called for a type of muntin from Alenco’s available product line. The approved shop drawing references Alenco’s “Series 2665 Single Hung 1/1 w/ exterior grid.” Exh. 20. Alenco’s product catalogue shows that windows with this muntin exist in its available product line. Exh. 1(19) at 6. Considering that the false muntin window was in Alenco’s available product line, there was nothing about the muntin that made the supplied windows “special” or "non-standard."

During trial, however, Wallace admitted that the panning profile for the windows was its source of delay during fabrication. This is significant because, unlike the muntins, the panning system specified in the contract was never changed by the Government, was never alleged by Wallace to have been defective and, in fact, was not defective.

The record shows that Wallace never asserted that the panning specification was defective and never made a request to the Navy that the panning specification be waived or relaxed. In addition, a review of the contract reveals that the pertinent details for the panning specification were very clear. Tr. 620-24 (referring to joint exhibit 17). In fact, the panning proposed by Alenco in its March 24, 1994 letter to Wallace, and detailed by Alenco on its shop drawing dated March 30, 1994, is the exact profile for the panning specified in the contract. Exh. 1(20), Exh. 1(22) at sheet 2 of 4, detail 1. More significantly, when the submittal and shop drawings were provided to the Navy, neither Wallace nor Alenco mentioned they would need additional time necessary to fabricate the specified panning system. In fact, in its letter of March 24, 1994, six days prior to the submission of its shop drawing, Alenco proposed a bull-nosed type historical panning profile to meet the window specification requirement, which was approved and ultimately installed. Exh. 1(22).

It is significant that Wallace's own scheduling consultant, Mr. Ostrowski, did not trace the delays in window fabrication and delivery to the muntin issue. Instead, he characterized all of this delay as attributable to "the impact on the delivery of the special windows that had to be made." Tr. 427-28. He opined that, "because of the special nature of those windows the full delivery time–fabrication and delivery time–was out of the control of the contractor." Tr. 427-428. Nowhere in his report, however, did Mr. Ostrowski allege that the panning specifications were defective.[6] At trial, he explicitly acknowledged that the defect in the specification

[6] In fact, according to Mr. Ostrowski's report, Wallace's concerns about the defective window were and are limited only to the muntin issue. See Exh. 2 at 4 n. 2 (stating that "the Specifications are defective in that the windows could not meet both historic and wind loading requirements," which clearly relates solely to the muntin issue). See also Exh. 1(22, 23) (Alenco's letters of March 24 and March 30, 1994, addressing the muntin issue in terms of

concerned the muntins, not the panning system. Tr. 483-484. Therefore, although Mr. Ostrowski's interpretation of Alenco's correspondence was that the requirement for convex panning impacted the production time for the windows, he never attempted to tie the production timeline to a defective Government specification. Tr. 460, 484.

The suggestion by Mr. Ostrowski that the Government is responsible for the additional time needed by Alenco for producing the panning requirement presents two problems. First, the fact that a contractor and/or a supplier (and in this case a testifying expert) consider a window's panning to be "special," by their own terms, does not render the specification defective or make any associated delays attributable to the Government. In this case, the panning on the windows ultimately provided by Wallace were the exact pannings specified in the original contract. Modification P00005 made no changes to the panning. Exh. 1(10) at 17. If Wallace or its supplier wants to characterize them as special windows because they differed in terms of the panning profile that Alenco prefers to produce (or can produce more quickly), its characterization is immaterial as to whether that particular specification was, in fact, defective. Second, contrary to Wallace’s inference at trial, delays suffered by a construction contractor due to its own lack of planning, or proper coordination of subcontractors and suppliers, are clearly attributable to the contractor and not the responsibility of the Government. FAR 52.249-10.

The Government’s expert, Mr. Weathers, observed that Wallace’s actions and inactions introduced approximately 75 days of delay into the fabrication cycle. He found a 15-day delay by Wallace in providing Alenco the approval of its shop drawings, from April 21, 1994 (when

conflicting requirements in terms of meeting the architectural/historical requirements and at the same time meeting the required wind loading requirements).

Wallace received approval), to May 6, 1994 (when Alenco received the approval from Wallace). Exh. 1(12) at 27; Tr. 893-94. He also found a 30-day approval cycle between Alenco and Wallace from June 6, 1994, to July 6, 1994, Exh., 1(12) at 27; Tr. 89, as well as a 30-day delay in the delivery of the windows from August 22, 1994, to September 20 or 22, 1994. Exh. 1(12) at 27; 894–95. Wallace has failed to establish entitlement to any excusable or compensable delay during this period.

### C. Summary Of Evidence Relating To The Installation Phase

The problem with the muntins did not cause delay in the installation phase of the project, nor did Wallace ever advance such a theory. At trial, Wallace did not present any evidence that the defective specifications were the cause of delay in the window installation phase of the project. In fact, Mr. Wallace's own testimony shows that he understood that the delays in the installation phase were not attributable to, or traceable to, the defective muntin specification. Tr. 58-59. He also acknowledged down time from December 15, 1994, to January 11, 1995, while they were waiting for three final windows to be delivered. Tr. 55-56.

The only theory advanced by Wallace in its claim was that the Government allegedly required Wallace to complete one window before proceeding to the next. Exh. 1(12). Wallace contended that the revised method for window replacement, though later relaxed, was a slower method than that anticipated under the contract. Exh. 1(12) at 5. As set forth at trial, Wallace has failed to support this claim and has all but abandoned it. See Tr. 171-87.

In sum, neither Mr. Wallace, nor his scheduling consultant, advanced any coherent facts or theory as to how or why the Government was responsible for any of the delays suffered by Wallace during installation as a result of any specification.

**V. Concurrent Contractor Delays**

Even if the Court were to find that the Government was responsible for any further delay beyond those already granted through modifications, Wallace has not met its burden to show there were no concurrent contractor delays. Wallace's scheduling consultant has conceded plaintiff's responsibility for 98 days of delay during the contract performance. Exh. 2 at 8; Tr. 424-26, 434, 436-37, 457, 471. Further, Wallace admitted that, as late as February 7, 1994, when the Navy issued a cure notice to Wallace, Wallace was delinquent in submitting additional submittals not pertaining to windows, and Wallace's consultant acknowledged that during this general time frame Wallace was approximately three months behind on the roofing work. Tr. 71-72, 451.

**VI. Apportionment of Delay**

In this case, Wallace has failed to prove any delay on the part of the Government, except that already conceded by the Government in its modifications. Wallace, therefore, is not entitled to recover for any delay damages. Alternatively, if the Court finds Wallace has proved that any additional delays were caused by the defective specification, those delays must be carefully apportioned.

In recent years, the United States Court of Appeals for the Federal Circuit has required scrutiny of construction contract schedules to ascertain whether delays can be apportioned between the parties. In Kinetic Builder's Inc. v. Peters, 226 F.3d 1307, 1316-17 (Fed. Cir. 2000), the court affirmed a decision of the Armed Services Board of Contract Appeals in which the board denied the contractor overhead costs because the record did not provide a basis for apportioning those incurred as a result of the Government's delay and those incurred as a result

of the contractor's delay.[7] In Essex Electro Engineers, Inc. v. Danzig, the court remanded a case for further consideration on the apportionment of concurrent delays. 224 F.3d 1283, 1295-96 (Fed. Cir. 2000). Accordingly, it is clear that the Court should apportion responsibility for delays where the facts allow a definite and clear segregation of the delays, and the damages caused by these delays.

## VII. Conclusion

For the reasons discussed above, the Court should deny Wallace's claims for remission of liquidated damages and for compensable delay damages.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

[7] Significantly, that decision also affirms the board's finding that the contractor was not entitled to recover for alleged Government delay in resolving a defective specification because the contractor failed to meet its burden of proof as to causation. See Kinetic, 226 F.3d at 1317.

s/Deborah A. Bynum

DEBORAH A. BYNUM
Assistant Director

OF COUNSEL

ELLEN M. EVANS
Department of the Navy
Washington, DC 20374

s/Kenneth S. Kessler

KENNETH S. KESSLER
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St., NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 305-7562
Facsimile: (202) 305-7643
Attorneys for Defendant

Date: March 24, 2004