# In The United States Court of Federal Claims

No. 96-222 C

(Filed: December 15, 2004)

| | | |
|---|---|---|
| R.P. WALLACE, INC., Plaintiff, v. THE UNITED STATES, Defendant. | * * * * * * * * * | Trial; Navy building renovation and repair contract; liquidated damages; standard for remitting liquidated damages where concurrent and sequential delays; *United Engineering* limited in light of subsequent Supreme Court decision in *Robinson*; *Sauer* followed; defective window specifications; extent of impact; allocation; delay damages. |

**OPINION**

*John Connelly McManus*, McManus & Graham, LLP, Atlanta, Georgia, for plaintiff.

*Kenneth S. Kessler*, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Peter D. Keisler*, for defendant.

**ALLEGRA, Judge:**

At least since the shock of exploding fireworks caused the scales to fall on poor Helen Palsgraf, courts have applied temporal and spatial limitations on the availability of tort damages, invoking familiar doctrines such as proximate cause and forseeability. *See Palsgraf v. Long Island R. Co.*, 284 N.Y. 339, 162 N.E. 99 (1928). Similar principia have evolved in contract cases and, not surprisingly, have wended their way into the regulatory and decisional fabric of Federal procurement law, particularly in assessing responsibility for delays in the completion of a contract, and especially in considering the validity of liquidated damages assessed for delay.

The latter topics are the subject of this action, which springs from a contract between plaintiff, R.P. Wallace, Inc. ("R.P. Wallace"), a construction firm, and defendant, the United States acting through the Department of the Navy ("the Navy"), for renovation and repair work to a New Orleans, Louisiana naval facility. When, in its view, this contract was not completed on time, the Navy assessed liquidated damages against plaintiff. Following trial in New Orleans, plaintiff seeks remission of those liquidated damages, as well as compensable damages, for what it contends was government-caused delay and disruption.

## I. FINDINGS OF FACT

Based on the record, including the parties' stipulations, the court finds as follows:

On September 28, 1993, the Navy and plaintiff entered into contract number N62467-91-C-7226 ("the contract") for various repairs to be made to Building 58 at the Naval Support Activity in New Orleans, Louisiana. Under the contract, plaintiff was responsible, *inter alia*, for re-roofing the building, removing an elevator penthouse, painting the interior and exterior, and replacing all the existing exterior windows with thermal break insulating glass aluminum frame units. Morton-Verges, Architects (Morton-Verges), the Navy's architect and engineer for this project, prepared the contract's plans and specifications, and was responsible for reviewing and commenting on all submittals made by the contractor.

Because Building 58 is a historic structure, the contract specifications called for replacement windows that conformed to the building's historic appearance and, therefore, differed from standard office-building windows in several respects. The contract drawings provided various details regarding these windows, including specifics on their panning and muntins.[1] Detail 3/4 of sheet 4 of the contract drawings specified the design for the aluminum panning of the window jambs, requiring it to be convex. Additionally, the specifications required that the replacement windows use historically accurate "true" muntins that could support a "design pressure" of 65, indicating an ability of the glass to withstand wind loads of almost 160 miles per hour.[2] Further, Section 08520, ¶1.4.6.a of the contract required R.P. Wallace to submit as a sample "one full-size window with muntins of type proposed for use, complete with [American Architectural Manufacturers Association] label, glazing, hardware, anchors, and other accessories." Regarding installation of the windows, General Note 16 of sheet 1 of the contract drawings provided that the "Contractor will not be allowed to remove more windows than can be replaced in the same day."[3]

---

[1] A nutshell on window parts is in order: "Panning" is trim material used in window replacements to cover up the original trim. "Muntins" are short or light strips of wood or metal separating and holding panes of glass in windows. "False" muntins provide the familiar cross-hatch of "true" muntins, but do not support the glass and instead are usually placed on the inside of the window. Muntins are to be distinguished from "mullions," which are the major structural vertical or horizontal wood or metal members between window units or sliding glass doors.

[2] Emphasizing that the muntins had to be capable of bearing this pressure, paragraph 2.1 of the window specifications incorporated, by reference, American Architectural Manufacturers Association publication 101, section 1.5.2 of which states that "structural members shall be designed to withstand the full design load for the project site."

[3] The record indicates that this provision was added to the specifications because Building 58 was occupied and the Navy wanted to minimize the disruption occasioned by the window installation.

The contract required R.P. Wallace to commence performance within ten days of the award, and to finish no later than 165 days after the award (15 calendar days for the mailing of the award and the contractor's submission of required bonds, and 150 calendar days to prosecute the work). Based upon the September 28, 1993, award date, the original completion date thus was March 12, 1994. Section 0101, ¶ 1.9 of the contract provided that "[i]f the Contractor fails to complete the work within the time specified in the contract, or any approved extension, liquidated damages shall be assessed the Contractor in the amount of $200.00 for each calendar day of delay."[4]

On November 3, 1993, the parties conducted a preconstruction conference, at which, according to the minutes, the Navy recommended a "tentative start date" of "early December 1993." On December 9, 1993, another meeting was held, the minutes of which reported –

> The contractor has designated both suppliers and subcontractors for window and door work. Submittals are currently being prepared for the window and door work. Lead time on windows is approximately six weeks and installation will take approximately four weeks.

Notwithstanding, as of January 3, 1994 – over ninety days into the expected 165-day contract period and sixty days after the preconstruction conference – plaintiff had neither provided any of the required submittals nor performed any work at the Building 58 site. On that date, plaintiff notified the Navy that it would provide the required window submittals on January 7, 1994. On January 5, 1994, the Navy sent plaintiff a letter noting that "55 percent of the contract time has elapsed with no on site work" and that "it appears that you will be unable to complete [the] contract work by the contract completion date." The letter also noted that the window submittal, as well as "many material submittals[,] remain outstanding" and warned that liquidated damages would be assessed for inexcusable delay. Despite plaintiff's prior assurances, January 7, 1994, passed without plaintiff providing the Navy with the window submittals.[5]

On February 7, 1994, the Navy issued a cure notice to R.P. Wallace pointing out that "with only 34 days remaining before the contract completion date . . . you have made only

---

[4] The contract also incorporated, by reference, the liquidated damages provisions of section 52.212-5 of the 1984 version of the FAR. In relevant terms, these provisions are essentially identical to the language quoted above.

[5] By January 5, 2003, R.P. Wallace had made the paint submittals required by the contract. In its complaint, R.P. Wallace averred that the solicitation's paint and vinyl siding specifications, which the Navy admitted were defective, had also contributed to its performance delays. At trial, however, plaintiff essentially abandoned this claim and the court thus does not delve into factual details regarding these issues.

minimal progress toward completion" and listing a dozen submittals that remained outstanding.[6] This notice closed by indicating that "the Government considers your failure to perform a condition that is endangering completion of this contract. Therefore, unless this condition is cured within 10 days after receipt of this notice, the Government may terminate for default." According to plaintiff's daily production and quality control reports, it began work on the site on February 8, 1994. Plaintiff responded to the Navy's cure notice on February 23, 1994, stating that it had just received that notice and promising a line-by-line review of the deficiencies listed therein.

On February 28, 1994, two weeks prior to the scheduled completion date, plaintiff finally provided its window submittal. On March 11, 1994, plaintiff sent the Navy a letter indicating that all outstanding submittals had been provided and citing, but not identifying, "several factors which have contributed to the delay in completion of the contract." While this letter indicated that "[w]e will be addressing these factors under separate cover shortly," there is nothing in the record indicating that such a document was ever prepared or sent to the Navy. On March 14, 1994, Morton Verges wrote the Navy indicating that while the window submittal met various of the contract's specifications, it did not comply with the "window and trim design." Regarding the latter requirements, the letter explained that "[p]rior to completing the construction documents we verified with a local glass company that reasonable duplication was possible. Therefore we should insist that trim panning and muntins match existing as detailed." On March 15, 1994, the Navy wrote plaintiff, indicating that performance was now overdue and requesting that plaintiff "take all measures to mitigate potential damages and submit your application for [sic] time extension accompanied by such substantiating data as appropriate." On March 16, 1994 – four days after the original scheduled completion date for the project – the Navy rejected the window submittal for four reasons: (i) the sample proposed a concave, rather than a convex, panning, as required by the contract; (ii) plaintiff proposed using false muntins instead of the true muntins called for by the contract; (iii) the sill was not properly sloped, as specified in the contract; and (iv) the submittal was not a full-sized window sample.

On March 24, 1994, Alenco, the contractor that had created the window submittal for R.P. Wallace, sent plaintiff a letter discussing the grounds for the Navy's rejection. It advised plaintiff that it could revise the submittal to include the convex panning required by the contract, noting that it owned "two extrusion presses, which allows us to design and extrude our own profiles in house." Alenco, however, indicated that it was impossible to build an aesthetically acceptable window using true muntins that complied with the contract's wind resistance requirements, emphasizing "we can offer the Navy either the historic type false muntin as we have already submitted, or we can offer a true muntin. However, we can no longer offer a

[6] The administrative submittals on this list were: schedule of prices, construction schedule, submittal register, list of contractor personnel and vehicles, and subcontractor statements of acknowledgment. The material submittals on this list were: unit masonry, preformed vinyl siding, aluminum windows, glazing, metal support systems and wall insulation, gypsum board and painting resubmittal.

combination of both, nor can anyone else." Regarding the muntins, this letter further adumbrated:

> What it boils down to . . . is that the Navy can have either the structural integrity offered by a bulky true muntin, or they may have the atheistic [sic] value of a false muntin, but not both! The Navy will not find another manufacturer capable of performing this feat, or able to present a test report to substantiate it.

This is the first clear evidence in the record that plaintiff was aware of the defects in the contract's window specifications. On March 30, 1994, Alenco again wrote plaintiff, reemphasizing that true muntins of a size necessary to meet the wind resistance requirements would not be "the most pleasing to the eye."

On March 31, 1994, plaintiff delivered another window submittal to the Navy, albeit not a full-sized sample, together with a letter from Alenco explaining why it was impossible to build the windows as specified. At this time, plaintiff requested a variance from the contract specifications regarding muntins. On April 11, 1994, the Navy notified R.P. Wallace that its request for a variance from the contract specifications for the muntins was being "referred to both the engineer of record and Public Works engineering for guidance" and reminded plaintiff that it had failed to submit a full-sized window sample with its shop drawings. On April 19, 1994, a full-sized window sample was delivered to the worksite, but could not be approved because its glass was broken.

On April 21, 1994, the Navy advised R.P. Wallace that it had approved the variance for the muntins, contingent upon the receipt and approval of a sample window. Describing the rationale for this decision, the parties have stipulated, as follows:

> The Navy's specifications for the windows were defective in that they included two incompatible requirements: (1) the windows had to meet current wind load requirements to remain intact through a hurricane, and, at the same time, (2) were required to be duplicates of the original windows they were replacing, i.e., to have full muntins between each pane of glass in a multi-pane window. The penetration of the window by true muntins would have weakened the glass to such an extent that it could not meet the wind load requirement. A solid pane for the entire window could meet the wind load requirement; however, the muntins required to maintain the wind load requirement with individual panes would have been much larger than the original muntins, rendering them unacceptable for aesthetic reasons.

On April 26, 1994, plaintiff wrote the Navy highlighting the defective specification and seeking relief from anticipated liquidated damages, asserting that "the delay encountered is as a result of defective specifications and further is clearly from unforeseeable causes beyond the control and without fault or negligence of the contractor." In a response dated April 29, 1994, the Navy wrote that "the government is in agreement that the design is defective, and that an equitable time

adjustment must be made." This letter requested that plaintiff apply for a time extension listing "the specific delays (i.e., provide description and dates), the number of days lost by reason of such delays, that such delays impacted the critical path of the project and were not concurrent with one another." It further stated that "the government will reduce the amount of liquidated damages for the number of days of the government estimated time extension."

On May 6, 1994, R.P. Wallace delivered the approved window submittal to Alenco for production. At this point, Alenco began to take steps to fabricate the windows. On May 23, 1994, plaintiff received a response from the Navy to one of its invoices in which the latter had deducted anticipated liquidated damages. That same day, plaintiff wrote the Navy asserting that the "delay is clearly and indisputably the result of a defect in contract specifications" and that it should "not be subjected to liquidated damages as a result of same." Notwithstanding, on May 26, 1994, the Navy sent plaintiff a letter in which it expressed its intention to assess liquidated damages based upon a revised contract completion date of May 1, 1994. On June 6, 1994, Alenco received the custom extrusion dies needed to create the convex panning, conducted tests and promptly sent samples to R.P. Wallace. For reasons unexplained, R.P. Wallace did not approve the custom panning profiles and release the windows for manufacturing until July 6, 1994.

On August 19, 1994, plaintiff delivered the Navy a letter dated August 17, 1994, in which it contested the deduction of liquidated damages from a prior invoice. In this letter, plaintiff asserted:

> As has been well documented in writing, by both the contractor and the Navy, the delay we have encountered is a direct result of a defect in contract specifications. As a consequence of our job progress being delayed, as a result of the defective specifications, it is my understanding that we will not be subject to liquidated damages.

On August 22, 1994, the Navy notified R.P. Wallace by letter of its intent to extend the contract by 36 days in connection with the window submittals. This 36-day extension represented "the period of time between return of [the] initial submittal (16 March 1994) and approval of [R.P. Wallace's] resubmittal (26 April 1994)." The letter invited R.P. Wallace to present information if it believed it was owed additional time for the window submittal. On August 22, 1994, plaintiff responded to the Navy's letter, again asserting that the defective specifications relieved it of "any liability for liquidated damages."[7]

---

[7] This letter limned the difficulties that plaintiff had encountered in finding a window supplier in the following terms:

> We struggled with producing the window submittal for subject contract. Our struggles were tied directly to the fact that we were dealing with a defective specification, a condition not immediately known to us. We had several window

On September 20, 1994, Alenco delivered the first of several batches of windows to the work site, at which point, following the Navy's approval, R.P. Wallace began to install them. On October 21, 1994, the Navy executed modification no. P00004, unilaterally modifying the contract to grant plaintiff a time extension of 36 calendar days in compensation "for any and all window delays for the period between the return of the initial window submittal (16 March 1994) and approval of the resubmittal (26 April 1994)."[8] The adjustment (together with two other unrelated adjustments totaling 19 days) resulted in a final contract performance date of May 6, 1994.

Following the receipt of a last batch of windows on January 9, 1995, plaintiff finished installing the windows on January 11, 1995, at which time the Navy took beneficial occupancy of Building 58.[9] The Navy assessed plaintiff liquidated damages of $200 per day for the entire period from the modified completion date of May 6, 1994, to January 10, 1995 – a total of 250 days – resulting in $50,000 in liquidated damages. On June 7, 1995, plaintiff delivered to defendant a claim for compensation in the amount of $130,402 for delays allegedly caused by the defective specifications, as well as a claim for remission of the entire $50,000 in liquidated damages. Both claims asserted that all the contract delay was directly attributable to the defective window specifications. Unpersuaded, on or about December 1, 1995, the Navy denied both

---

> suppliers who passed on becoming involved in this contract by simply stating they could not meet the specifications. Then finally, our supplier, Alenco, made it clear to us the problem was not in meeting the specifications, but, in fact, the problem is the specification is defective. Much time and effort had gone into producing a window submittal and when it was learned by us, that our problem was tied directly to a defective specification, this was of course, brought to the attention of the Navy.

[8] The aforementioned May 26, 1994, letter from the Navy to R.P. Wallace, provided the following fuller explanation for the 36-day extension:

> The amount of the time extension due the contractor for the defective window specifications was computed as the time between when the first and second window submittals were returned. It is reasonable to assume that had the government specified the proper windows, the first window submittal would have been approved. Therefore, the government began to delay the contractor the day the first window submittal was disapproved until the day the second window submittal was approved (conditionally). The first window submittal was returned to the contractor on 16 March 1994, and the second window submittal was returned to the contractor on 21 April 1994. This is a difference of 36 days. Adding 36 days to the current contract completion date of 26 March 1994 results in a new estimated contract completion date of 1 May 1994.

[9] Although plaintiff had originally projected that it would take 28 days to complete the window installation, it actually took 113 days to complete this task.

claims. While conceding that the design specifications were defective, the Navy asserted that the 36-day equitable adjustment properly compensated plaintiff for the delays caused by the defect and contended that other factors within plaintiff's control – notably, what it claimed was plaintiff's failure to perform the preliminary project work for the project in a timely manner – caused the additional delay. It also found that plaintiff had failed to provide evidence that any additional delay resulted from the Navy's conduct.

On April 24, 1996, plaintiff filed its complaint in this court, seeking $130,402 in delay damages, $50,000 in remitted liquidated damages, interest, costs, and attorney's fees. On January 12, 1998, R.P. Wallace amended its complaint to reduce its claim for delay damages to $65,753.65. On August 15, 2001, plaintiff filed a motion for partial summary judgment. This case was transferred to the undersigned on July 24, 2002, and on October 16, 2002, the court granted, in part, plaintiff's motion for partial summary judgment. Specifically, the court held that defendant would be bound by its concession that both the contract's painting specifications and aluminum window specifications were defective, but that genuine issues of fact precluded granting summary judgment on the issue whether the defective specifications proximately caused delay in completion of the contract.

Trial in this case was held from May 5 to 7, 2003, in New Orleans. At trial, plaintiff presented the testimony of its principal, Ronald Wallace, and one of its employees, Roland Fortenberry, describing the problems that were encountered during its performance of the contract. Defendant countered with testimony from several Navy personnel involved in the administration of the contract, all of whom emphasized deficiencies in plaintiff's performance. Both parties relied heavily on experts, who used critical path method analysis[10] to apportion the causes of the 305 days of project delays encountered here. Plaintiff's expert, Mr. Ostrowski, attributed 98 of those days to plaintiff and 207 to defendant, while defendant's expert, Mr. Weathers, attributed 250 days of delay to plaintiff and 55 concurrently to plaintiff and defendant.

---

[10] The Court of Claims once described the critical path method as

> an efficient way of organizing and scheduling a complex project which consists of numerous interrelated small projects. Each subproject is identified and classified as to the duration and precedent of the work . . . The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project.

*Haney v. United States*, 676 F.2d 584, 595 (Ct. Cl. 1982); *see also Manuel Bros., Inc. v. United States*, 55 Fed. Cl. 8, 49 n.8 (2002).

Pursuant to the court's order of December 3, 2003, supplementary post-trial briefs were filed on March 24, 2004, by defendant, and April 5, 2004, by plaintiff.

## II. DISCUSSION

Having failed to complete the renovations of Building 58 by the appointed date, plaintiff was assessed $50,000 in liquidated damages under section 01010, ¶1.9 of the contract. That section provided that "[i]f the Contractor fails to complete the work within the time specified in the contract, or any extension, liquidated damages shall be assessed the Contractor in the amount of $200.00 for each calendar day of delay." Plaintiff seeks remission of these damages, as well as recovery of delay damages allegedly caused by the Navy.

### A. Background Legal Principles

As a threshold matter, the court must focus on whether plaintiff's delay in completing the contract was "excusable" within the meaning of FAR § 52.249-10(b), a provision incorporated into the contract. That section states that a contractor shall not be charged with damages, if "[t]he delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor." *See Sauer, Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000). Relevant examples of such causes include: "acts of the Government in either its sovereign or contractual capacity" and "delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers." 48 C.F.R. § 52.249-10(b)(1). These salvific provisions, however, are triggered only if "[t]he Contractor, within 10 days from the beginning of any delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of delay." *Id*; *see generally, Decker & Co. v. West*, 76 F.3d 1573, 1581 (Fed. Cir. 1996) (describing the operation of these provisions). To the extent plaintiff can show the existence of excusable delay beyond that previously allowed by the Navy, it is entitled to the remission of liquidated damages, and potentially the recovery of delay damages.

The excusable delay provisions of FAR § 52.249-10 are silent as to how a contractor should demonstrate the existence and extent of such delay. Nonetheless, the decisional law is well-settled that –

> When a contractor is seeking extensions of contract time, for changes and excusable delay, which will relieve it from the consequences of having failed to complete the work within the time allowed for performance, it has the burden of establishing by a preponderance of the evidence not only the existence of an excusable cause of delay but also the extent to which completion of the contract work as a whole was delayed thereby.

*Morganti Nat'l , Inc. v. United States,* 49 Fed. Cl. 110, 132-33 (2001) (quoting *Santa Fe, Inc.*, VABCA No. 1943, 84-2 BCA ¶ 17,341, at 86,410, 1984 WL 13360 (1984)), *aff'd*, 36 Fed. Appx.

452 (Fed. Cir. 2002).[11] The contractor must prove that the excusable event proximately caused a delay to the overall completion of the contract, *i.e.*, that the delay affected activities on the critical path. *See Sauer*, 224 F.3d at 1345 (citing *Mel Williamson, Inc. v. United States*, 229 Ct. Cl. 846, 850-51 (1982)), *see also* John Cibinic, Jr. & Ralph Nash, Jr., *Administration of Government Contracts* (hereinafter "Cibinic & Nash") 583 (3d. ed. 1995). And it must also establish the extent to which completion of the work was delayed – it "'is entitled to only so much time extension as the excusable cause actually delayed performance.'" *Morganti*, 49 Fed. Cl. at 132 (quoting *Robert P. Jones Co.,* 76-1 BCA ¶ 11,824, at 56,457, 1976 WL 24288 (1976) (citations omitted)).

Thornier issues are posed by concurrent or sequential delays – the first occurring where both parties are responsible for the same period of delay, the second, where one party and then the other cause different delays *seriatim* or intermittently. *See Essex Electro Engineers v. Danzig*, 224 F.3d 1283, 1295-96 (Fed. Cir. 2000) (distinguishing concurrent from sequential delays). Concurrent delay is not fatal to a contractor's claim for additional time due to excusable delay, but precludes the recovery of delay damages. "If a period of delay can be attributed simultaneously to the actions of both the Government and the contractor," this court has stated, "there are said to be concurrent delays, and the result is an excusable but not a compensable delay." *Morganti*, 49 Fed. Cl. at 132; *see also Weaver- Bailey Contractors, Inc. v. United States*, 19 Cl. Ct. 474, 476 (1990); *Utley- James, Inc.*, 85-1 BCA ¶ 17,816, at 89,109, 1984 WL 13874 (1984) (citing *Dawson Constr. Co.*, 75-2 BCA ¶ 11,563, at 55,204, 1975 WL 1808 (1975)). Summarizing the law on this point, the Federal Circuit, in *Essex Electro Engineers*, 224 F.3d at 1295 (internal quotations omitted), recently reiterated that a contractor "generally cannot recover for concurrent delays for the simple reason that no causal link can be shown: A government act that delays part of the contract performance does not delay the general progress of the work when the prosecution of the work as a whole would have been delayed regardless of the government's act." *See also Kinetic Builders, Inc. v. Peters*, 226 F.3d 1307, 1316-17 (Fed. Cir. 2000).[12]

---

[11] In *Sauer*, the Federal Circuit likewise opined that "a party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled." 224 F.3d at 1347; *see also Aptus Co. v. United States*, 61 Fed. Cl. 638, 647 (2004); *PCL Constr. Servs., Inc. v. United States*, 53 Fed. Cl. 479, 484 (2002); *CJP Contractors, Inc. v. United States*, 45 Fed. Cl. 343, 372 (1999).

[12] The rule stated in *Essex Electro Engineers* has a rich provenance, dating at least to *Newport News Shipbuilding & Dry Dock Co. v. United States*, 79 Ct. Cl. 25 (1934). There, the Court of Claims declined to find defendant liable for delays on the ground that plaintiff could not establish causation, stating "[i]f, as the plaintiff contends, the work was delayed because of the failure of the Government to furnish certain parts, . . . such delay ran concurrently with other delays for which the defendant was not responsible and did not result to any appreciable extent in delaying the final completion" of the project. *Id* at 36; *see also Tuller Constr. Co. v. United States*, 118 Ct. Cl. 509, 526 (1951); *Coath & Goss, Inc. v. United States*, 101 Ct. Cl. 702, 714-15 (1944); *CEMS, Inc. v. United States*, 59 Fed. Cl. 168, 232 (2003).

A more heated debate surrounds the treatment of sequential delays, the law on which has aptly been described as "unsettled." *PCL Constr. Servs*., 53 Fed. Cl. at 486. One constellation of cases, often identified with *Acme Process Equipment, Co. v. United States*, 347 F.2d 509 (Ct. Cl. 1965), *rev'd on other grounds*, 358 U.S. 138 (1966), follows the so-called "rule against apportionment," and holds that "'where delays are caused by both parties to the contract the court will not attempt to apportion them, but will simply hold that the provisions of the contract with reference to liquidated damages will be annulled.'" *Id*. at 535 (quoting *Schmoll v. United States*, 91 Ct. Cl. 1, 28 (1940)). As its mainstay for this rule, *Acme* drew on *United States v. United Engineering & Constructing Co.*, 234 U.S. 236, 242 (1914). In the latter case, work on a pumping station was delayed beyond the completion time initially set by the contract solely because of the government's fault. To complete the work, the parties executed two contract amendments, neither of which fixed the time for completing the work nor mentioned liquidated damages. Nonetheless, the government assessed liquidated damages against the contractor, contending that after the government's delay, it had further delayed completion of the contract. The Supreme Court concluded that the contractor could not be held liable for liquidated damages under the original contract, reasoning that "when the contractor has agreed to do a piece of work within a given time, and the parties have stipulated fixed sum as liquidated damages . . . in order to enforce such payment the other party must not prevent the performance of the contract within the stipulated time; and that where such is the case, and thereafter the work is completed, though delayed by the fault of the contractor, the rule of the original contract cannot be insisted upon, and liquidated damages measured thereby are waived." *Id*.

Decisions broadly applying the "rule against apportionment" frequently quote this passage from *United Engineering*.[13] Yet, other cases have refused to extend *United Engineering* beyond its facts. Although occasionally accused of turning a blind eye to precedent, these cases, in fact, take their lead from a later Supreme Court case, *Robinson v. United States*, 261 U.S. 486 (1923). In that case, Justice Brandeis, writing for a unanimous court, upheld a Court of Claims decision apportioning liquidated damages, despite sequential delays caused by both parties. Unlike the contract documents in *United Engineering*, the contract in *Robinson* provided that the contractor "shall be allowed one day, additional to the time herein stated, for each and every day of . . . delay" caused by the government and a supplemental agreement did not alter this provision. 261 U.S. at 487-88. The contract was completed 121 days after the amended completion date and the government asserted that only 12 days of this delay were its fault, assessing liquidated damages against the contractor for the remainder. *Id*. at 487. The contractor brought suit in the Court of Claims arguing, under *United Engineering*, that "since the government had caused some of the delay, the provision for liquidated damages became wholly inapplicable and was unenforceable."

---

[13] *See, e.g., Acme,* 347 F.2d at 535; *Commerce Int'l Co. v. United States,* 338 F.2d 81, 90 (Ct. Cl. 1964); *Vogt Bros. Mfg. Co. v. United States*, 160 Ct. Cl. 687, 709 (1963); *Schmoll*, 91 Ct. Cl. at 28; *Plack & Deal v. United States*, 66 Ct. Cl. 641, 645(1929).

*Id*. This court's predecessor, however, made short shrift of this contention,[14] albeit allocating only 61 days of the delay to the contractor. Unsatisfied with this partial victory, the contractor appealed.

The Supreme Court affirmed the Court of Claims. It held that the liquidated damages clause was enforceable, despite the delay caused by the government, reasoning –

> The fact that the government's action caused some of the delay presents no legal ground for denying it compensation for loss suffered through the fault of the contractor. Since the contractor agreed to pay at a specific rate for each day's delay not caused by the government, it was clearly the intention that it should pay for some days' delay at that rate, even if it were relieved from paying for other delays, because of the government's action.

*Id*. at 488. The Court observed that the contractor's attempt to nullify the liquidated damages clause placed undue weight on the chronology of the delays, noting that "[i]f it had appeared that the first 61 days' delay had been due wholly to the contractor's fault, and the government had caused the last 60 days' delay, there could hardly be a contention that the provision for liquidated damages should not apply." *Id*. at 488-89. It then distinguished *United Engineering,* holding that "[t]he question there was one of construction" of the supplemental agreements, based upon which construction, the Court there had concluded that "the provision for liquidated damages [was] not applicable." *Id*. at 489. "Here," the Court indicated by way of contradistinction, "the question is not properly one of construction." *Id*.

*Robinson* thus teaches that the mere existence of sequential delay does not require a court to annual a liquidated damages provision and that *United Engineering* only requires annulment

---

[14] In finding *United Engineering* inapposite, the Court of Claims explained:

> The contention by the plaintiff that he is not chargeable with any liquidated damages can not be sustained. The case of *United Engineering Co.*, 234 U. S. 236, is not applicable to the instant case. The contract provides a definite period from which the liquidated damages are to be computed, and in case of delays by the Government or suspensions, in the circumstances stated above, it is provided that one day be added to the contractor's time for each day of delay. These delays being ascertained, the time of completion is as definitely fixed as if written in the contract itself. The theory that the entire liquidated damage clause is defeated by a provision intended to protect and save it, and at the same time to accord to the contractor some relief, is not to be adopted where the contract shows plainly that its intent is to furnish the means of definitely ascertaining the period during which the contractor should be charged with the agreed damages.

57 Ct. Cl. 7, 24 (1921).

where, due to government delay, the contract documents in question no longer provide a valid reference date from which to calculate liquidated damages.[15] That said, neither *Robinson*, nor the Court of Claims opinion it affirmed, has received much attention in recent cases in this circuit dealing with the apportionment issue. While one might suspect that *Robinson* has been overruled, research reveals otherwise – it remains good law and has been cited by other courts and commentators, both in distinguishing *United Engineering* and generally rejecting the "no apportionment" rule in favor of its "clear apportionment" rival. *See, e.g., Southwest Eng'g Co. v. United States*, 341 F.2d 998, 1000-01 (8th Cir. 1965), *cert. denied*, 382 U.S. 819 (1965); *Aetna Cas. & Sur. Co. v. Butte-Meade Sanitary Water District*, 500 F. Supp. 193, 196-97 (D.S.D. 1980); *In re Sante Fe, Inc*., 84-2 B.C.A. ¶ 17,341, at 86,409, 1984 WL 13360 (1984); *Nomellini Constr. Co. v. California*, 19 Cal. App. 3d. 240, 245, 96 Cal. Rptr. 682, 685 (1971); Note, *No Way Out: "Liquidating" Stipulated Damages for Construction Delay in Public Construction Contracts*, 44 Duke L. J. 357, 383, 411-12 (1994). Conversely, courts broadly construing *United Engineering,* as precluding the government from recovering any liquidated damages where it is partially responsible for delaying completion of a contract, have uniformly ignored both opinions in *Robinson*. *See, e.g., Youngdale & Sons Constr. Co., Inc. v. United States*, 27 Fed. Cl. 516, 564 (1993); *Fortec Constructors, Inc. v. United States*, 8 Cl. Ct. 490, 508-09 (1985).[16]

---

[15] The earliest Court of Claims decision to construe *United Engineering*, *New York Continental Jewell Filtration Co. v. United States*, 55 Ct. Cl. 288 (1920) recognized the limitations inherent in that decision. In *New York Continental*, which was decided before *Robinson*, the court, indeed, nullified the liquidated damages clause – but not simply because part of the delay was attributable to the government, but rather because the government's delay pushed the completion beyond the date fixed in the contract and the parties had not fixed another date for the completion of the contract. In this regard, the Court of Claims observed that "[w]e think the law is plain that the court must be able to fix the day from which liquidated damages must be enforced." *Id*. at 296. Citing *United Engineering*, the court went on to conclude:

> It is well settled that in cases where delays have been caused by both parties to a contract and the completion of the contract has thereby been extended beyond the time fixed[,] the obligation for liquidated damages is annulled, and it can not be revived, and any recovery for subsequent delays must be for actual loss proved to have been sustained.

*Id*. (emphasis added).

[16] In this court's view, the welter of confusion on this issue stems not only from a general failure to interpret *United Engineering* in light of *Robinson*, but also from several decisions that use the terms "concurrent" and "sequential" interchangeably. Typically, these cases erroneously rely upon decisions applying the nonapportionment rule to concurrent delays for support in applying the same rule to a sequential delay. S*ee, e.g., Commerce Int'l Co.*, 338 F.2d at 89-90 n.11 (citing eight cases for the proposition that "there can be no delay where the defendant's delay is concurrent," five of which dealt only with sequential delays).

In yet another curious twist, the Federal Circuit, in *Sauer*, recently applied the apportionment rule to a case involving sequential delay, but without citing *Robinson*. The court upheld a decision of the Armed Services Board of Contract Appeals that had apportioned delay in reviewing whether liquidated damages assessed against the contractor should be remitted. The Board had reached this result despite specifically finding the government responsible for certain days of delay, yet the Federal Circuit refused to annul the liquidated damages provision at issue. Instead, like the Board, it applied the apportionment rule, affirming the Board's decision to award the government liquidated damages for certain days of delay caused by the contractor, while attributing other days of delay to the government. 224 F.3d at 1347. This result, the court believed, flowed from the basic rule that "a party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled." I*d*. Finally, upholding the distinction between sequential and concurrent delay, the Federal Circuit distinguished several cases refusing to allow liquidated damages in the case of concurrent delay as being "inapposite" and "inapplicable." *Id*.

In *PCL Services*, 53 Fed. Cl. at 487, this court criticized the panel in *Sauer* for failing to follow prior precedent, notably, *United Engineering.* The exegesis above, however, reveals that criticism to be unwarranted and misdirected: *Sauer* was correctly decided, consistent not only with the Supreme Court's opinion in *Robinson*, but that of the Court of Claims, as well. The same cannot be said of cases like *Acme* that have broadly applied the nonapportionment rule beyond the factual contours of *United Engineering*. Such cases post-date *Robinson* and, to the extent they directly conflict with the two decisions therein – that of the Supreme Court and the Court of Claims – are not precedential. *See Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir.1988) (""Where there is a direct conflict [between decisions of this court], the precedential decision is the first."); *see also Nystrom v. Trex Co.*, 374 F.3d 1105, 1112 n.2 (2004). To the extent these cases can hospitably be viewed in more limited terms – as applying, like *United Engineering*, only to contracts that, owing to government delay, no longer provide a reference point for the calculation of liquidated damages – they are certainly *sui generis* here. The contract at issue, by incorporating the standard FAR clauses on liquidated damages and excusable delay, provides a ready basis upon which to determine the contract's completion date and, correspondingly, by which to apportion the responsibility for delay here. Ultimately, then, the apparent conflict on how to treat sequential delay is more cry than wool – binding precedent, not to mention general contractual principles,[17] logic and fairness, all compel this court, under the circumstances presented, to follow *Sauer* and *Robinson*, and to reject cases to the contrary. *See*

---

[17] Notably, early decisions, such as *United Engineering*, holding liquidated damage clauses unenforceable, often expressed a general hesitancy to enforce such clauses. *See DJ Mfg. Corp. v. United States*, 86 F.3d 1130, 1134-35 (Fed. Cir. 1996) (discussing this point). As reflected in the current Restatement on Contracts, that view no longer finds currency in the law. *Compare* Rest. Contracts § 339(1) (indicating that liquidated damage provisions were "unenforceable" unless certain limiting conditions were met) *with* Rest. (Second) Contracts § 356(1) (indicating that such provisions are enforceable unless violative of "public policy" and a "penalty").

*Tyger Constr. Co. v. United States*, 31 Fed. Cl. 177, 256-58 (1994) (apportioning fault for sequential delays occurring in different years).

It remains to apply these principles to the facts found here, focusing initially on the remission of liquidated damages and, ultimately, to the extent necessary, on the claimed delay damages.

**B. Is Plaintiff Entitled to a Remission of Liquidated Damages?**

Although not listed in FAR §52.249-10, defective specifications plainly can give rise to excusable delay. *See United States v. Spearin*, 248 U.S. 132, 135-36 (1918) (discussing the rule at common law); *Franklin Pavkov Constr. Co. v. Roche*, 279 F.3d 989, 994-95 (Fed. Cir. 2002); *J.D. Hedin Constr. Co. v. United States*, 347 F.2d 235, 241 (Ct. Cl. 1965), *overruled on other grounds by Wilner v. United States*, 24 F.3d 1397 (Fed. Cir. 1994) (en banc). R.P. Wallace contends that the Navy's defective window specifications delayed and disrupted its performance, entitling it to remission of all the liquidated damages asserted against it. While defendant does not contest that the defective specifications were harmful, it vigorously asserts that, on the record before the court, plaintiff has not shown that it is entitled to more than the 36 days of excusable delay already granted in modification P00005 of the contract. Tracking the approach employed by the experts who testified in this matter, in analyzing these assertions, the court will examine three distinct periods in the contract's performance – the first leading up to the approval of the window submittal, the second while the approved windows were being fabricated, and the last primarily involving the installation of the windows.

The first period in question – the submittal phase – began with the award of the contract and ended with the Navy's approval of the second window submittal on April 21, 1994, a period of approximately 210 days. For this period, plaintiff provided evidence that it was delayed in finding a window manufacturer because the contract originally called for a window that was essentially unavailable and could not be manufactured – one in which the historical type of true muntins specified could not reasonably accommodate the wind resistance requirement. Plaintiff's owner, Mr. Wallace, testified that, over a period of several weeks, he and his staff conducted an extensive search for the windows specified in the contract, contacting a number of window manufacturers and suppliers, first in the Mobile, Alabama area, then in the greater New Orleans area, and eventually nationwide. According to Mr. Wallace, none of the firms contacted could or would provide quotes on the windows, as specified. He also testified that, frustrated by these developments, his staff eventually contacted the Navy's architectural firm for assistance and was reassured – incorrectly, as it proved out – that, according to unspecified window manufacturers in the New Orleans area, the window specifications were obtainable. While defendant asserts this testimony was sketchy and notes that plaintiff did not present corroborating testimony from Alenco or any other window manufacturer, the court finds Mr. Wallace's testimony on this point credible. If nothing else, his testimony is consistent with the fact that, owing to the defective specifications, his company was charged with the sisyphean task of seeking the window equivalent of a "square circle." Indeed, when pressed, defendant's expert, Mr. Weathers, agreed that, based on the exchange of correspondence and specifications, it might

take up to three weeks for a contractor to conclude that a product that it was seeking could not be obtained. As such, based upon the record, the court thus concludes that, beyond the 36 days already allowed by defendant, plaintiff has established that, for the submittal period, it is entitled to an additional period of excusable delay totaling 21 days.

While plaintiff, particularly through its expert, asserts that the impact of the defective specifications during this period was somewhat greater, there is considerable evidence to the contrary. For one thing, plaintiff has admitted that, around the same time it was searching for a window supplier, contract performance was delayed for thirty days due to the death of Mr. Wallace's grandmother, an event for which plaintiff applied for, but did not receive, a contract extension. In addition, according to minutes of a meeting held on December 9, 1993, plaintiff that day represented that it had designated suppliers and subcontractors for the windows, that submittals for the windows were being prepared and that time for the preparation and installation of the windows was approximately six and four weeks, respectively. This suggest that by December 9, 1993, plaintiff had already made contact with Alenco, even though the window submittal was not provided until months later.[18] Finally, other documents in the record, specifically, a certificate of compliance, indicate that by January 12, 1994, plaintiff and Alenco had already selected the aluminum window that, for unexplained reasons, was not provided to the Navy until February 28, 1994.

The second period in question – the window fabrication and delivery phase – began with the approval of the window submittal and ended with the delivery of the majority of the windows approximately 110 days later, on September 20, 1994. Plaintiff does not seriously argue that the defective specifications directly delayed the fabrication of the windows – indeed, the record indicates that the lion's share of the manufacturing delay was attributable to fabricating the convex aluminum panning on the windows, a feature of the original specifications that was not defective. Rather, R.P. Wallace contends that once its efforts to meet the original window specifications led it to Alenco and the specifications then were determined to be defective, it was inalterably committed to Alenco and "stuck" with whatever delivery schedule the latter could provide.[19] The factual flaw of this argument, however, is that plaintiff produced no evidence,

---

[18] Consistent with this interpretation of the facts, in early January of 1994, one of plaintiff's employees, Mr. Fortenberry, notified the Navy that the window submittals would be received by January 7, 1994. Moreover, in the March 24, 1994, letter that Alenco sent to plaintiff, it suggested that it had been involved with the project as early as the bidding process.

[19] When asked why it took five months to manufacture the windows, Mr. Wallace responded "[w]ell, you know, this was out of our hands. We've now got it in Alenco's hands." Plaintiff's expert, Mr. Ostrowski, similarly testified that, during the fabrication and delivery phase –

> It is my opinion then that because of the special nature of those windows the full delivery time – fabrication and delivery time was out of the control of the contractor. They were at the mercy of whatever it would take to get these special

beyond the self-serving statements of its officers, that, once the defective specifications were corrected, it had no reasonable choice but to subcontract with Alenco. The lack of proof on this point is all the more startling as trial revealed that plaintiff apparently knew, at or around the time it initially authorized Alenco to proceed, that the latter would need 22 weeks to complete a job that plaintiff had originally estimated and represented would take, at most, eight.[20] Yet, there is no indication that plaintiff even considered going elsewhere. Making matters worse for plaintiff, the record reveals delays in the fabrication process that are indisputably attributable to plaintiff, including a one-month delay – from June 6, 1994, to July 6, 1994 – for plaintiff to approve the sample panning that Alenco had extruded.[21]

---

> windows made. They came in some 22 weeks after the approval had been granted from the government for those windows. That whole time I attribute to the government due to the special nature of the windows.

Emphasizing the breadth of this assertion, at another point in his testimony, Mr. Ostrowski indicated that had Alenco taken 44, rather 22 weeks, to fabricate the windows, the delay, in his view, still would have been attributable to the defendant.

[20] Mr. Wallace testified that once the window submittal was approved, he did not go to another window manufacturer, because "Alenco was the only game in town." While this may have been true prior to the time the defective muntin specification was discovered and corrected, there is no indication that such was the case after the specifications were changed. Nor is there any indication that plaintiff even tried at that point to obtain either a different supplier or a better schedule from Alenco. On this point, the court credits defendant's expert, Mr. Weathers, who, when asked if plaintiff should have stayed with Alenco when advised that it would take 22 weeks to fabricate the windows, testified:

> I would have expected that there would be some research done, perhaps a question to the architect who he designed around, if he had any suppliers in mind, whether the Navy could, but at that I point I would certainly think that it would be given consideration to go elsewhere.

Mr. Weathers further testified that it would have been reasonable for R.P. Wallace to contact other suppliers to see what schedule they could produce.

[21] At various points, plaintiff seems to contend that the delay in the fabrication phase was excusable because the window for the project required special panning that Alenco was required to design and extrude. But, as noted, this panning requirement was fully disclosed in the initial specifications, which also plainly stated that contractor was required to "[d]esign windows to accommodate hardware, glass, weatherstripping, and accessories to be furnished," thereby revealing that the windows were not off-the-shelf items. As such, it was for plaintiff to determine, during the bidding process, whether it could acquire the windows in enough time to perform the contract on a timely basis. Its failure to do so is not attributable to defendant. *See In re Appeal of Cole Constr. Co., Inc.* 96-2 B.C.A. ¶ 28,579, 1996 WL 571623 (1996) (noting, in

As such, for the fabrication period, plaintiff plainly has neither shown that the delay in completing the work was "beyond [its] control," nor that the "delays" experienced by Alenco in delivering the windows were "from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers." 48 C.F.R. § 52.249-10(b)(1)(xi); *see also* Cibinic & Nash, at 547 ("If the contractor can prevent an event from occurring, it is not beyond its control."). Rather, donning rose-colored glasses, plaintiff seems to operate now, as it did then, on the assumption that once the original design of the windows was found to be defective, both it and the Navy were "stuck" with whatever schedule Alenco could provide. That sticky assumption is counterfactual, particularly given the apportionment rule, discussed above, under which the government's initial delay did not absolve plaintiff from having to obtain the windows in a timely manner, so as to minimize further delay in the completion of the contract. Indeed, in analogous circumstances, various decisions have held contractors liable for delays occasioned by their failure to replace a subcontractor or supplier delaying performance. *See, e.g., Decker & Co.*, 76 F.3d at 1581 (contractor not entitled to excusable delay where it failed to replace subcontractor causing delay); *Progressive Tool Corp*, 94-1 B.C.A. ¶ 26,413, 1993 WL 398704 (1993) (no excusable delay where contractor did not show that it made reasonable attempts to locate an alternate supplier); *Signal Contracting, Inc.*, 83-1 B.C.A. ¶ 16,424, 1982 WL 9220 (1982), *aff'd*, 727 F.2d 1118 (Fed. Cir. 1983) (no excusable delay when contractor did not demonstrate that another source could not have timely delivered); Cibinic & Nash, at 565.[22]

Because it builds upon the supposed foundational delays encountered in the fabrication phase, plaintiff's case is weakest for the final period involved here – the installation phase – which began with the arrival of the windows and ended approximately 16 weeks later, on January 11, 1995, when the windows were completely installed. While plaintiff initially estimated that it could install all 74 replacement windows in 28 days, it actually took 113 days, or 85 days longer.

---

comparable circumstances, the contractor "had a choice to enter the contract, or not to enter the contract, based on the information presented by the contract terms proffered"). Moreover, the delay in extruding the aluminum panning was "foreseeable" at the time of the contracting and, for that reason alone, does not give rise to excusable delay under FAR § 52.249-10. *See* Cibinic & Nash, at 550; *Fox Constr., Inc v. General Servs. Admin*, 93-3 B.C.A. ¶ 26,193, 1993 WL 216760 (1993) (defective specification not cause of delay where delay due to contractor's failure to consider nondefective contract requirements); *see also Carnegie Steel Co. v. United States*, 240 U.S. 156, 165 (1916) (delay caused by simple inability to perform on time is not excusable).

[22] *See also, e.g., Appeal of JTL, Inc.*, 98-2 B.C.A. ¶ 29,873, 1998 WL 391909 (1998) (noting that, under comparable excusable delay provisions, the risk of an untimely performance by a subcontractor is on the contractor); *Appeal of Granite Constr. Co.*, 89-2 B.C.A. ¶21,683, 1989 WL 29822 (1989) ("manufacturing backlog has been consistently denied by the courts and boards as an excuse for delay or non-performance"); *Appeal of Occupacia Const.*, 88-2 B.C.A. ¶ 20,820, 1988 WL 61535 (1988) (denying relief under a clause similarly worded to FAR §52.249-10 based on a backlog by a manufacturer); *Northern Virginia Elec. Co. Inc.*, 80-1 B.C.A. ¶ 14,239, 1979 WL 2369 (1980) (same).

Again, plaintiff does not assert that the defective specifications directly caused this delay. Rather, it contends that: (i) it had originally anticipated installing the windows while it reroofed the building; (ii) by the time the windows were received, that task had been completed; and (iii) as a result, there were fewer individuals on site to assist with the installation of the windows. But, this assertion makes no sense for several reasons.

First, the record reveals no critical path relationship between the roofing and window installation tasks, as plaintiff used different subcontractors for each of these purposes.[23] Second, daily progress reports indicate that plaintiff's installation subcontractor sometimes had adequate staff in place to install multiple windows, but more often did not – indeed, for entire weeks it had no staff at the site at all. These progress reports not only decidedly clash with plaintiff's claims regarding staffing, but also refute another reason given by plaintiff for the installation delay – that the contract specifications restricted it to installing only one window per day. The reports, in fact, reveal that on days when it had sufficient staffing, plaintiff's subcontractor installed multiple windows. More importantly, the specifications did not limit the installation to one window per day, but rather simply provided that the "Contractor will not be allowed to remove more windows than can be replaced in the same day."[24] There is no indication that this requirement delayed the completion of the installation, let alone produced the sort of delay that would be excusable within the meaning of the FAR.[25] Moreover, it appears that the delay over the last portion of this period, from December 15, 1994, through January 11, 1995, was attributable to the fact that three of the windows received from Alenco had been damaged in transit and needed to be replaced.

---

[23] On this point, Mr. Wallace testified that the workers at the site were not cross-trained, indicating further that "we had a subcontractor that did the window installation, and, as I recall, . . . they did just that, the window installation."

[24] The record suggests that plaintiff may have misunderstood this requirement, but not owing to any fault on the part of the Navy. Apparently, at some point around September 20, 1994, R.P. Wallace provided the Navy with a window replacement schedule. On September 30, 1994, the Navy responded to this schedule noting that "[n]o mention is made to completing one window area entirely before proceeding onward." Apparently misinterpreting the latter statement, on October 4, 1994, plaintiff submitted a revised schedule that stated "[e]ach window to be completed prior to moving to next window." Testimony indicates that when this confusion was identified, the Navy verified that plaintiff need not replace only one window at a time.

[25] It should be noted that the record does not support the claim made by Mr. Ostrowski that the majority of the delay in the installation of the windows occurred not because of a shortage staff, but because two smaller batches, totaling 9 to 12 windows, were not delivered until November 18, 1994, and January 10, 1995, respectively. Even were this claim true, plaintiff did not show that the delay in receiving these last windows was attributable to defendant – indeed, it appears that at least some of these windows were broken when originally shipped. At all events, it is notable that Mr. Wallace, from whom Mr. Ostrowski drew his factual information, did not himself offer this as an explanation for the installation delay.

Accordingly, the record does not support plaintiff's excusable delay claim for the installation period.

Finally, a point about notice. As to all the claims in question, defendant argues that plaintiff failed to comply with that portion of FAR § 52.249-10 which requires the contractor to notify the contracting officer in writing within 10 days from the beginning of any excusable delay, stating the cause of that delay. Research reveals no case that has really interpreted this provision. In general, however, the courts have held that such notice provisions should "not be applied too technically and illiberally where the Government is quite aware of the operative facts." *Hoel-Steffen Constr. Co. v. United States*, 456 F.2d 760, 768 (Ct. Cl. 1972); *see also Copco Steel & Eng'g Co. v. United States*, 341 F.2d 590, 598 (Ct. Cl. 1965); *Miller Elevator Co., Inc. v. United States*, 30 Fed. Cl. 662, 699 (1994). Consistent with this view, the court believes that for this provision to be triggered, the contractor must know the cause of the delay sufficiently to be able to assert that it is "unforeseeable," "beyond [its] control," and "without [its] fault or negligence" within the meaning of the regulation. To require notice sooner would be to put a contractor in the untenable position of seeking an extension before it could demonstrate or document its entitlement thereto. Such an interpretation of the regulations makes no sense.

Under the court's interpretation of the notice clause, plaintiff appears to have provided timely notice to the contracting officer for the delay associated with the submittal phase. It did not ascertain the reasons for the delay it had been experiencing in obtaining a window conforming to the specifications until approximately March 24, 1994, when Alenco explained the problem. Plaintiff then apprised the Navy of all the facts relating to this delay no later than seven days later, on March 31, 1994. To be sure, plaintiff did not formally request relief from the liquidated damages until April 26, 1994, but, in the court's view, by that time the Navy was fully aware of the operative facts regarding the specification problem. Accordingly, in the court's view, the notice requirement of FAR § 52.249-10 was met in the case of the 21 additional days delay the court has found to be excusable.

The situation, however, is far different as to plaintiff's claims with respect to the fabrication and installation periods. According to plaintiff, it knew that it would be unable to install the windows on a timely basis as early as April 21, 1994, when it authorized Alenco to proceed with the fabrication of the aluminum panning and the fabrication of the windows. At this time, plaintiff knew that the windows would be fabricated in approximately 22 weeks, rather than the originally-projected six to eight weeks. Yet, it did not notify the Navy of this until August 19, 1994, when a letter dated August 17, 1994, was provided to Lt. Turner – even though on May 26, 1994, Lt. Turner had indicated the Navy's intention to assess liquidated damages based on the assumption that the fabrication and installation of the windows would take eight weeks and 31 days respectively. Moreover, the August 17, 1994, letter did not reveal that fabrication delays were continuing and could cause additional delays in the installation of the windows. Unlike the situation with the defective specifications, then, plaintiff's failure to alert the Navy to the problems being experienced in fabricating and installing windows prejudiced the Navy by preventing it from reviewing the situation and taking appropriate steps to minimize the projected delays. As such, plaintiff's failure to provide proper notice as to the delays being

encountered in fabricating and installing the windows provides a second, independent basis upon which to deny any further excusable delay for these phases of the project. *See Decker & Co.*, 76 F.3d at 1581 (contractor not entitled to extension where timely notice of delays being experienced by subcontractors not provided).

### C. Is Plaintiff Entitled to Delay Damages?

The court need not tarry in respect of the remaining issue here – whether plaintiff is entitled to delay damages for the 21 days that the court has concluded constitute a further period of excusable delay. In fact, such damages are not awardable for at least two reasons. First, there is clear indication that during the three-week period in which plaintiff had difficulty in identifying a window supplier, there was concurrent delay. Among other things, during the fall of 1993, when plaintiff encountered the delay in question, it failed to meet a number of contract deadlines, including that for submitting at least a dozen administrative and material submittals. Moreover, it also appears that during this same period, delay occurred because of the death of Mr. Wallace's grandmother. Accordingly, plaintiff cannot recover damages for this period because "prosecution of the work as a whole would have been delayed regardless of the government's act." *Essex Electro Engineers*, 224 F.3d at 1295 (internal quotations omitted). Second, to cinch matters, plaintiff, at trial, failed to provide evidence from which this court can authenticate and validate its allegedly recoverable expenses. Instead, plaintiff was satisfied to rely on attachments to its complaint and various analyses conducted by defendant rejecting the lion's share of its claimed expenses. In the court's view, such evidence is inadequate to establish a basis for recovery.

## III. CONCLUSION

Based on the foregoing, the court finds that plaintiff is entitled to remission of liquidated damages for 21 days, which, at $200 per day, amounts to a recovery of $4,200. While the court recognizes that this may be somewhat a Pyrrhic victory, the short of it is that, in all other respects, plaintiff's claims simply are unsupported by the record or the law. The Clerk shall enter an appropriate judgment. No costs.

**IT IS SO ORDERED.**

s/Francis M. Allegra
Francis M. Allegra
Judge